**INTERTEL, INC., Appellant/Cross–Respondent,**

v.

**SEDGWICK CLAIMS MANAGEMENT SERVICES, INC., Respondent/Cross–Appellant,**

and

**Lori Morgan, and MJM Investigations, Inc., Respondents.**

Nos. ED 85163, ED 85201.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 30, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 9, 2006.

Application for Transfer Denied
Nov. 21, 2006.

Charles E. Reis, St. Louis, MO, for MJM Investigations.

Jeffrey D. Sigmund, Steven M. Berezney, St. Louis, MO, for Lori Morgan—Resp. and Sedgwick—Resp./Cross–App.

NANNETTE A. BAKER, Presiding Judge.

### Introduction

Intertel, Inc. ("Intertel") appeals from a judgment entered after a jury returned a unanimous verdict in favor of Intertel on its breach of contract claim against Sedgwick Claims Management Services, Inc. ("SCMS") in the amount of $31,000.00 and verdicts in favor of Intertel on all of SCMS's counterclaims. Intertel claims eight points on appeal and SCMS claims one point on cross-appeal. We affirm in part and reverse and remand for new trial.

### Factual Background and Proceedings Below

SCMS, a third-party claims administrator, handles insurance claims in the insurance industry. Large corporations that choose to self-fund their own insurance losses hire companies like SCMS to review and evaluate claims. These self-funded corporations then provide money to third-party administrators to process submitted claims.

Many states have enacted legislation requiring companies like SCMS to utilize Special Investigative Units ("SIUs") for investigating claims. SIUs not only investigate claims, but also create fraud plans and educational programs for employees regarding the proper method of conducting investigations. Under this system, a claim is submitted to SCMS and if an SCMS examiner suspects fraud, the claim is sent to a SIU firm. Upon receiving the claim, the SIU assigns the claim to a local investigation firm ("vendor") to conduct the investigation that SCMS requested.

Irl B. Baris, St. Louis, MO, for Intertel.

The vendor ultimately sends its field report to SCMS. To get paid, the vendor must submit a bill to the SIU who then adds in overhead charge and sends the bill to SCMS for payment. Using funds from the client's bank account, SCMS sends a check to the SIU for the total amount so that the SIU can pay the vendor its share.

SCMS and Intertel entered into a service agreement ("Service Agreement") whereby Intertel became SCMS's SIU as of October 1999. The Service Agreement had no fixed term of months or years. Instead, it continued until either party terminated it upon sixty days' written notice or if breached, upon written notice by the non-breaching party. Under the agreement, Intertel's responsibilities were limited to claims that SCMS "specifically referred" to it per "Exhibit A." Exhibit A states that parties would follow the referral procedures outlined in SCMS's SIU Manual ("SIU Manual").

Soon after Intertel signed the Service Agreement, Intertel began experiencing both performance and financial problems as the SIU. In 2000, SCMS customers began complaining about Intertel's SIU services. Intertel's employee Lori Morgan ("Morgan"), the National Account Manager for the SCMS account at the time, ran the SIU program and handled Intertel's SIU performance problems.

As of September 2000, Intertel's liabilities exceeded its assets by over $230,000.00. After one year as the SIU, Intertel posted an annual loss of $27,559.00. In December 2000, Intertel told SCMS that it needed $300,000.00 to continue its business and asked SCMS to invest capital in Intertel for that amount. A week later, Intertel requested an additional $58,000.00 from SCMS because Intertel was unable to satisfy its current payroll and rent obligations. SCMS told Intertel that SCMS would have to conduct due diligence prior to making such an investment decision. In January 2001, SCMS sent a team to Intertel to review Intertel's financial records. After reviewing the records, on February 6, 2001, SCMS declined Intertel's investment request.

SCMS decided instead to assist Intertel by providing $5,000.00 per month and waiving the revenue-sharing provision of the Service Agreement. The revenue-sharing provision required Intertel to pay SCMS 15% of business referred to Intertel by SCMS. A month later, Intertel asked SCMS to provide it with an additional $30,000.00 to cover its payroll.

SCMS continued receiving complaints from its clients about Intertel's performance as the SIU. Vendors complained that they did not receive payment from Intertel for services rendered. In May 2001, SCMS terminated the SIU relationship with Intertel over the phone. On June 4, 2001, SCMS sent a letter to Intertel entitled "Partial Termination of Service Agreement" notifying Intertel that as of August 3, 2001, it would no longer be SCMS's SIU. Yet, SCMS did not terminate the entire business relationship. SCMS continued to use Intertel for select investigative services, namely its 3–in–1 Claims Intelligence Program ("3–CIP")[1] and certain hospital investigative checks. SCMS selected MJM Investigations, Inc. ("MJM"), one of Intertel's vendors, to be the new SIU after August 3, 2001.

Shortly after SCMS terminated Intertel as the SIU, SCMS and Intertel began discussing Morgan's employment with In-

---

1. The 3–CIP is an extension of the claim-handling process that allows insurance companies, third-party administrators, and risk managers to investigate a larger number of bodily injury or mental anguish claims.

tertel, since she would no longer manage the SIU for Intertel. Intertel could benefit in allowing Morgan to work for SCMS because she would be in a position to refer investigative business back to Intertel. Intertel offered her a bonus for any business she referred to Intertel. Intertel waived her non-compete clause, allowing Morgan to leave Intertel's employment and commence employment with SCMS on June 15, 2001.

In August 2001, SCMS learned that the vendors had not received $301,977.40 that SCMS had paid Intertel to pay the vendors for services they provided SCMS clients. On September 24, 2001, SCMS terminated all remaining business relationships with Intertel by letter, effective November 20, 2001.

In February 2002, Intertel filed suit against SCMS, Morgan and MJM (collectively "Defendants"). In its Count I ("Count I"), Intertel alleged that Defendants entered into a civil conspiracy to drive Intertel out of business. Specifically, Intertel alleged that SCMS embarked on a campaign to take over Intertel's business activities after utilizing purported sensitive information SCMS received from its due diligence in January 2001.

Intertel also brought breach of contract claims against SCMS ("Count II"), Morgan ("Count III") and MJM ("Count IV"). In Count II, Intertel alleged that under the Service Agreement SCMS was obligated to refer all claims to Intertel and breached the agreement by failing to do so. In Count III, Intertel claimed that Morgan breached her employment contract by leaving Intertel, joining SCMS, and wrongfully disclosing Intertel's purported confidential information and trade secrets to SCMS. In Count IV, Intertel alleged that when MJM contracted with Intertel to become a vendor for SCMS, MJM breached that contract by wrongfully disclosing Intertel's confidential information and trade secrets to SCMS.

Intertel also claimed that SCMS induced Morgan to breach her contract with Intertel ("Count V") and induced MJM to breach its contract with Intertel ("Count VI"). Intertel claimed SCMS induced both Morgan and MJM to breach their respective contracts to deprive Intertel of its business opportunities and rights. Intertel sought punitive damages on Counts I, V, and VI.

In its Answer, SCMS denied all of Intertel's claims and raised six counterclaims against Intertel: (1) fraud; (2) breach of fiduciary duty; (3) tortious interference; (4) breach of contract; (5) conversion; and (6) unjust enrichment. SCMS specifically alleged that it paid Intertel the amounts due to certain vendors for services rendered and that Intertel wrongfully kept the money and refused to pay those vendors.

SCMS also denied that it was obligated to refer all claims to Intertel because the Service Agreement did not require it and Intertel knew that many of SCMS's clients required that SCMS utilize a particular investigative firm other than Intertel. SCMS claimed that while some of SCMS's satellite offices were encouraged to utilize Intertel, they were never required to use Intertel exclusively for all of their investigative needs.

There were numerous discovery disputes. Intertel filed a motion to strike Defendants' pleadings for various alleged discovery violations; it was denied. Days before trial, Intertel served several subpoenas duces tecum on Defendants. On May 10, 2004, SCMS and Morgan each filed a motion to quash. The trial court granted the motions finding that Intertel's subpoenas duces tecum requests were vague, overbroad, and untimely.

Defendants moved in limine to exclude evidence or argument that the SIU Manu-

al required SCMS to refer a certain number of claims to Intertel based on the parol evidence rule. After a pre-trial hearing, the trial court agreed and granted Defendants' Joint Motion in Limine.

The trial court also granted Defendants' request that it prohibit Intertel from introducing evidence on punitive damages until Intertel made a submissible case on its intentional tort claims. Then, the trial court refused to grant Intertel's request to ask potential jurors about punitive damages in voir dire because of the possibility of severely prejudicing Defendants.

After Intertel finished its opening statement, MJM and Morgan moved for a directed verdict on Intertel's conspiracy and breach of contract claims against them (Counts I, III, and IV). MJM and Morgan noted that Intertel failed to refer to any breach of contract or conspiracy related to them and that under Missouri law, a directed verdict was proper. The court granted the motions for directed verdict, thus eliminating all of Intertel's claims against MJM and Morgan. The trial continued solely on Intertel's claims against SCMS.

At the close of Intertel's case, SCMS moved for directed verdict on Intertel's conspiracy claim (Count I) and the inducement to breach contract claims regarding Morgan (Count V) and MJM (Count VI). SCMS argued that Intertel failed to introduce any evidence that an agreement between SCMS and Morgan or SCMS and MJM existed or that an unlawful act occurred to support the conspiracy claim. SCMS also argued that Intertel failed to introduce any evidence that Morgan or MJM breached their respective contracts. The trial court agreed with SCMS and granted its motion for directed verdict on Counts I, V, and VI, leaving only Intertel's breach of contract claim against SCMS (Count II) as the sole remaining claim.

The jury found for Intertel on its breach of contract claim against SCMS and awarded Intertel $31,000.00. The jury also found for Intertel on the three counterclaims SCMS elected to submit—breach of contract, conversion, and unjust enrichment. The court entered judgment in accordance with the verdict on May 21, 2004 and assessed costs against SCMS. After the trial court denied Intertel's motion for new trial, Intertel appealed and SCMS filed its cross-appeal.

### Discussion

Intertel claims that the trial court erred in (1) failing to sanction SCMS and MJM for refusing to cooperate in discovery and to comply with court orders regarding discovery; (2) quashing the subpoena duces tecum served upon SCMS and MJM to produce documents at trial; (3) sustaining Defendants' objection to prohibit the introduction of the SIU Manual and other evidence for the purpose of showing that SCMS had a contractual obligation to refer all business to Intertel; (4) prohibiting Intertel from questioning potential jurors during voir dire on their position regarding punitive damages; (5) directing a verdict for Morgan and MJM on Count I (conspiracy claim against Defendants), Count III (breach of contract claim against Morgan), and Count IV (breach of contract claim against MJM) after Intertel made a submissible case; (6) directing a verdict for SCMS on Count I after Intertel made a submissible case; (7) directing a verdict for SCMS on Count V (inducing Morgan to breach her contract with Intertel) and Count VI (inducing MJM to breach its contract with Intertel) after Intertel made a submissible case; and (8) refusing to submit Intertel's Jury Instruction Number 7A ("Instruction 7A") and submitting SCMS's Jury Instruction Number 7 ("Instruction 7") instead. SCMS, in its one point on cross-appeal, claims that the trial

court erred in submitting Jury Instruction Number 12 ("Instruction 12") because it was an affirmative converse instruction that did not defeat SCMS's counterclaim even if it were true.

■■■ Intertel's claims on appeal regarding discovery violations,[2] the trial court's granting of motions in limine,[3] and the trial court's refusal to submit jury instructions [4] are governed by the abuse of discretion standard of review. An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances then before the trial court, and is so arbitrary and unreasonable as to shock the sense of justice and indicate lack of careful consideration. *S.R. v. K.M.*, 115 S.W.3d 862, 865 (Mo.App. E.D.2003). A ruling within the trial court's discretion is presumed correct and the appellant bears the burden of showing the trial court abused its discretion and that they have been prejudiced by the abuse. *Boyer v. Sinclair & Rush, Inc.*, 67 S.W.3d 627, 634 (Mo.App. E.D.2002). Where reasonable persons can differ about the propriety of the trial court's judgment, it cannot be said that the trial court abused its discretion. *Zimmer v. Fisher*, 171 S.W.3d 76, 79–80 (Mo.App. E.D.2005).

## I. *Discovery*

### A. Intertel's Discovery Claims Against Defendants

■■■ Intertel claims, in its first point on appeal, that the trial court abused its dis-

cretion in denying Intertel's motion to strike Defendants' pleadings and to enter default judgment against them.

On December 8, 2003, Intertel filed its Motion to Strike All Pleadings of Defendants and to Render a Judgment by Default Against All Defendants and to Assess Damages Against Defendants. Intertel claimed that Defendants failed to abide by the trial court's order regarding responses to Intertel's requests for production of documents and improperly withheld documents until a protective order was entered. Intertel also claimed that Defendants failed to appear at noticed depositions. On January 7, 2004, the trial court denied Intertel's motion.

A review of the discovery proceedings show that on January 6, 2003, the trial court ordered that "Defendants shall file their responses to [Intertel's] Request for Production of Documents by February 3, 2003." On February 3, 2003, Defendants SCMS and Morgan filed their responses to Intertel's request for production. In their responses, they raised objections and identified specific documents.

Also, on February 3, 2003, MJM filed objections to Intertel's Request for Production and made production contingent upon "agreement of a protective order." On February 18, 2003, MJM mailed Responses and Objections, referencing documents it did not produce and making

---

**2.** The trial court is vested with broad discretion regarding matters of discovery. *S.R. v. K.M.*, 115 S.W.3d 862, 865 (Mo.App. E.D. 2003). This court will not interfere with the trial court's decision to impose sanctions for discovery violations unless there is a clear showing of an abuse of discretion. *Id.*

**3.** The admission or exclusion of evidence is a matter of trial court discretion. *Boyer v. Sinclair & Rush, Inc.*, 67 S.W.3d 627, 634 (Mo.

App. E.D.2002). Our review is limited to an abuse of discretion standard. *Id.*

**4.** This court reviews a trial court's refusal to submit an instruction for abuse of discretion. *City of Sullivan v. Truckstop Rest., Inc.*, 142 S.W.3d 181, 197 (Mo.App. E.D.2004). An instruction has to be supported by substantial evidence, which is evidence which, if true, is probative of the issues and from which the jury can decide the case. *Id.*

production "contingent only upon the agreement of a protective order."

After Judge Ross recused himself, on May 6, 2003, Judge Kintz set a discovery completion date of October 27, 2003, a status/settlement conference for November 12, 2003, and the date of December 1, 2003 for filing dispositive motions. The trial court's order on January 6, 2003 was vacated with respect to the timing of the depositions so that all parties could proceed immediately.

On May 6, 2003, Intertel served a Notice to Take Depositions, which requested that Defendants and their corporate representatives appear at depositions commencing on May 14, 2003. Defendants claim that during the May 6, 2003 hearing the trial court instructed the parties to resolve all issues concerning a potential protective order. Those issues were never resolved.

Where reasonable persons can differ about the propriety of the trial court's judgment, it cannot be said that the trial court abused its discretion. *Zimmer*, 171 S.W.3d at 79–80. Our task here is not to determine whether we would have imposed the same sanctions under the same circumstances, but merely whether the trial court could have reasonably concluded as it did. *Id.*

Defendants filed timely responses to the discovery requests. Before Intertel served its Notice to Take Depositions, Defendants informed Intertel's counsel that it would be necessary to file a motion for a protective order before they would produce any witnesses. They withheld the production of documents, subject to agreement on a protective order. Intertel repeatedly neglected to address the proposed protective order and never signed it. The record reflects that Defendants acted in good faith and did not show a contuma-

cious and deliberate disregard for the authority of the trial court. Further, since the trial court reasonably concluded that it did not need to sanction Defendants, it was not an abuse of discretion for the trial court not to sanction Defendants for failing to comply with discovery. Point denied.

## B. Subpoenas Duces Tecum

■ Intertel claims, in its second point on appeal, that the trial court abused its discretion in quashing the subpoenas duces tecum served upon SCMS and MJM to produce documents at trial because they were vague, overbroad and untimely. Intertel denies that the subpoenas were vague, overbroad, or untimely.

Under Section 491.100.3,[5] "Where a subpoena commands the person to whom it is directed to produce the objects, books, papers, or documents designated therein, the court upon motion may, promptly, and in any event at or before the time specified in the subpoena for compliance therewith, quash the subpoena if it is unreasonable and oppressive. . . ." The determination of reasonableness of the requirement to produce documents rests within the sound discretion of the trial court. *State ex rel. Rowland Group, Inc. v. Koehr*, 831 S.W.2d 930, 933 (Mo. banc 1992).

In this case, the trial court ordered that all discovery be completed by October 27, 2003. Yet, Intertel sought the issuance of several subpoenas duces tecum on April 27, 2004. Intertel served the subpoenas on SCMS between three days and two weeks later. Upon motion, on May 14, 2004, the trial court quashed Intertel's subpoenas "as being vague, overbroad and untimely." Intertel claims that the trial court abused its discretion in quashing the subpoenas because the subpoenas were not "in any way untimely." Intertel admitted

**5.** All statutory references are to RSMo.2000, unless otherwise indicated.

that the discovery deadline was October 27, 2003 and that it did not file the subpoenas until April 27, 2004. The record plainly refutes Intertel's assertion that its subpoenas were not "in any way untimely." Therefore, the trial court did not err in quashing the subpoenas since they were not filed within the court's explicit discovery deadline. Point denied.

## II. Prohibiting SIU Manual's Admission into Evidence

Intertel claims, in its third point on appeal, that the trial court erred in sustaining Defendants' objection to Intertel's introduction of the SIU Manual and other evidence for the purpose of showing a contractual obligation of SCMS to refer all business to Intertel. Intertel claims that the trial court erred because the documents, on their face, showed that the SIU Manual was part of the complete integrated agreement between the parties. We agree.

On May 17, 2004, SCMS, MJM, and Morgan filed a Joint Motion in Limine to prohibit Intertel:

> ... from making any reference in *voir dire*, opening statement, closing statement or otherwise during trial, or from otherwise introducing evidence, testifying or eliciting testimony regarding any conversations or negotiations prior to, contemporaneous with or subsequent to the execution of either the Service Agreement between Defendant SCMS and Plaintiff, or the Vendor Agreement between [MJM and Intertel], that contradict, change or add to the terms of these written, unambiguous and integrated contract, because the parol evidence rule requires that the Court determine the intent of the parties solely from the four corners of the contracts themselves.

The trial court granted the joint motion in limine on this issue. During trial, Intertel made an offer of proof and the court sustained Defendants' objection to the SIU Manual, preventing it from being received in evidence.

The Service Agreement, signed on April 5, 2000, states that "Intertel will provide the professional services as described in Exhibit A (the 'Services'), attached hereto and made a part of this Agreement. Intertel's responsibility will be limited to those claims specifically referred to Intertel by SCMS in accordance with the procedures outlined therein." The Service Agreement also contains a merger clause providing, "This writing sets forth the full and final understanding of the parties as respects the matters described herein, and supersedes any and all prior agreements and understandings between them, whether written or oral with respect to or relating to this Agreement." The SIU Manual, dated October 28, 1999, states, "The SIU will coordinate and manage all surveillance's [sic] as well as other field investigative assignments." Intertel asks this court to consider the SIU Manual in order to prove that SCMS was obligated to refer all of its claims to the SIU.

A trial court has broad discretion to admit or exclude evidence at trial. *State v. Chaney*, 967 S.W.2d 47, 55 (Mo. banc 1998). This standard of review compels the reversal of a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion. *Id.* The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it and so arbitrary and unreasonable that the ruling shocks the sense of justice and indicates a lack of careful deliberation. *Eltiste v. Ford Motor Co.*, 167 S.W.3d 742, 750 (Mo.App. E.D. 2005).

Contract interpretation is a question of law. *Lacey v. State Bd. of Registration for the Healing Arts*, 131 S.W.3d 831, 838 (Mo.App. W.D.2004). The cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent. *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. banc 1995). In order to determine the intent of the parties, it is often necessary to consider not only the contract between the parties, but subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances that cast light on the intent of the parties. *Id.* In determining the intent of the parties to a contract, we review the terms of a contract as a whole, not in isolation. *Lacey*, 131 S.W.3d at 838.

According to the RESTATEMENT (Second) OF CONTRACTS Section 132 cmt. c. (1981), where the signature of the party to be charged is made or adopted with reference to an unsigned writing, the signed and unsigned writings together may constitute a memorandum. Matters incorporated into contract by reference are as much a part of the contract as if they had been set out in the contract *in haec verba*. *Lacey*, 131 S.W.3d at 839. So long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including a separate agreement to which they are not parties, and including a separate document which is unsigned. RICHARD A. LORD, WILLISTON ON CONTRACTS Section 30.25 at 232–34 (4th ed.1990). Where

a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument. *Id.* at 234–35. The incorporated matter is to be interpreted as part of the writing. *Id.* at 235.

In the instant case, both parties agree that the Service Agreement incorporates Exhibit A by reference. Since the Service Agreement incorporates Exhibit A by reference, Exhibit A constructively becomes part of the Service Agreement. *See id.* at 234–35. Exhibit A's reference to the SIU Manual must similarly be incorporated into the Service Agreement. Because Exhibit A refers to the SIU Manual, the SIU Manual becomes constructively a part of Exhibit A and correspondingly, a part of the Service Agreement. Exhibit A states that "SCMS and Intertel will follow the procedures outlined in the [SCMS SIU Manual]." Since the Service Agreement incorporated Exhibit A, which incorporated the SIU Manual, SCMS and Intertel must follow the procedures outlined in the SIU Manual.

The reasoning of the court in *Lusk v. Lyon Metal Products* is relevant to the instant case. 247 S.W.2d 617 (Mo.1952). *Lusk* involved a memorandum signed by both plaintiff and defendant where defendant appointed plaintiff to solicit orders for the sale of its products. *Id.* at 621. The memorandum referenced a manual with commission rates. *Id.* There were two references in the memorandum to the manual. *Id.* One stated, "Products as follows: All products covered in the Steel Equipment Division Price, Policy and Procedure Book [manual]." The other reference was "[t]he Company will lend its [manual] containing price, policy and procedure data; also current rates of commissions. Notices of changes in such [m]anu-

al will be sent from time to time as the Company may determine. This [m]anual shall be returned immediately upon request of the Company or upon the termination of this appointment." *Id.* The court in *Lusk* reasoned that even though the memorandum did not expressly provide that its provisions would be governed and controlled at all times by the manual, "the contract" consisted of both the memorandum and the manual, and that construed together, the terms of the contract were clear, definite and certain. *Id.* at 621, 622. Further, the court held that the memorandum's references incorporated the entire manual. *Id.* at 622.

By following the court's reasoning in *Lusk*, the argument for incorporation of the SIU Manual by reference is even stronger. Unlike the memorandum in *Lusk*, Exhibit A, which was constructively incorporated into the Service Agreement, expressly provides that "SCMS and Intertel will follow the procedures outlined in the [SIU Manual], which may be modified by agreement of the parties from time to time." The provisions of the SIU Manual clarify the language of and define the term "SIU Manual" in Exhibit A. The SIU Manual carefully spells out the procedures that SCMS and Intertel had to follow under the Service Agreement and their responsibilities and obligations. Therefore, the SIU Manual is relevant to determining and understanding the contract between the parties and the court abused its discretion in prohibiting Intertel from introducing the SIU Manual during trial. We reverse and remand on this point.

### III. Questioning Potential Jurors During Voir Dire Regarding Punitive Damages

In its fourth point on appeal, Intertel claims that the trial court abused its discretion in prohibiting Intertel from questioning potential jurors during *voir dire* about punitive damages. Intertel contends that it was an abuse of discretion for the trial court to refuse to follow established case law and prevent Intertel from exercising its right to ascertain any bias or prejudice of potential jurors against the award of punitive damages.

Intertel pleaded six separate counts in its First Amended Petition. Three counts sought punitive damages: the conspiracy claim against Defendants (Count I), the claim against SCMS for inducing Morgan to breach her contract with Intertel (Count V), the claim against SCMS for inducing MJM to breach its contract with Intertel (Count VI). MJM, in its answer, and SCMS and Morgan, in their joint answer, denied the allegations and asserted affirmative defenses based on constitutional grounds as to punitive damages. In its counterclaim, SCMS sought punitive damages against Intertel on four of its six counterclaims against Intertel: Counterclaim Count I for fraud, Counterclaim Count II for breach of fiduciary duty, Counterclaim Count III for tortious interference, and Counterclaim Count V for conversion.

Prior to trial, SCMS, MJM, and Morgan filed a Joint Motion in Limine to prohibit Intertel:

> ... from making any reference in *voir dire*, opening statement, closing statement or otherwise during trial, or from otherwise introducing evidence, testifying or eliciting testimony regarding punitive damages and Defendants' net worth, because [Intertel] cannot make a submissible case for punitive damages; or, alternatively, [Intertel] should be so precluded unless and until [Intertel] has established a prima facie case for Defendants' liability for punitive damages.

After discussions in chambers, the trial court granted the motion in limine. Dur-

ing the pre-trial conference the following conversation occurred:

Intertel's Counsel, Irl Baris ["Baris"]: Well, I can ask the jury about punitive damages.

Court: No.

Baris: Judge, I don't want to lead you into reversible error ... *Ashcroft* is clear.

Court: I'll go against *Ashcroft* and stay with my way. So we're not going to mention punitive damages at this stage of the proceedings, okay.

Due to concerns of prejudicing the jury in a bifurcated trial, the trial court granted the motion in limine, preventing Intertel's counsel from questioning the jury on punitive damages. During the trial, Intertel made an offer of proof by objecting to the trial court restricting the mention of punitive damages during opening statements. The trial court again overruled Intertel's objection.

▆▆▆▆ The trial court is vested with broad discretion in allowing or prohibiting question of the venire during voir dire. *Crawford ex rel. Crawford v. Shop 'N Save Warehouse Foods, Inc.* 91 S.W.3d 646, 652 (Mo.App. E.D.2002). The trial court's handling of voir dire will not warrant reversal absent a showing of abuse of discretion and likely injury. *Id.* We will not reverse the trial court's rulings made during voir dire, unless they clearly and manifestly indicate an abuse of such discretion. *Ashcroft v. TAD Resources Int'l,* 972 S.W.2d 502, 505 (Mo.App. W.D.1998). Not every trial error is reversible error mandating a new trial. *Id.* at 507. There must also be a determination that the complaining party was prejudiced by the error. *Id.*

▆▆▆▆ Voir dire is intended to provide both parties the opportunity to participate in the selection of a fair and impartial jury. *Id.* at 505. Inquiries attempting to ascertain whether a potential juror possesses a bias or prejudice which would prevent him or her from following the law are proper during voir dire. *Id.* at 505–506. In this respect, questions on voir dire which attempt to ascertain bias or prejudice as to the award of punitive damages, if an issue in the case, are relevant and permissible inquiries. *Id.* at 506.

In *Ashcroft,* the Western District dealt with the issue of whether voir dire questions as to punitive damages are permissible where the trial is to be bifurcated pursuant to Section 510.263.[6] 972 S.W.2d at 506. The court reasoned that where punitive damages are a relevant issue, voir dire questions designed to ascertain bias or prejudice of potential jurors against the award of punitive damages are proper, *even if the trial is bifurcated. Id.* (emphasis added). To hold otherwise would prevent a party from exercising his right to ascertain any bias or prejudice of potential jurors against the award of punitive damages. *Id.*

In *Ashcroft,* the appellant attempted to ask the venire a question concerning any bias or prejudice they might hold as to the award of punitive damages. *Id.* at 507. In doing so, he was not declaring to the venire what the law or instructions would be in the case, nor was he seeking from them a commitment to return a particular verdict. *Id.* The Western District found that the ruling of the trial court, in preventing appellant from questioning the venire as to punitive damages, was arbitrary and unreasonable. *Id.* As such, the Western District held that the trial court abused its discretion. *Id.* In *Ashcroft,* the court found reversible error mandating a

---

6. RSMo.1994.

new trial because it was reasonable to infer that some of the jurors could have been biased or prejudiced against the concept of punitive damages. *Id.*

Like *Ashcroft,* in the instant case, Intertel was prohibited from questioning the venire about punitive damages. When Intertel's counsel raised the issue during the pre-trial conference in chambers, there was discussion that the trial would be bifurcated. But the trial never was a bifurcated trial. As such, the policy reasons for limiting counsel from questioning the venire about punitive damages in bifurcated trials, as discussed in *Ashcroft,* are not present in this case. The trial court's ruling preventing Intertel from questioning the venire about punitive damages was arbitrary and unreasonable and an abuse of discretion.

However, unlike *Ashcroft,* the trial court's error here is not reversible because it was harmless. The trial court granted Defendant's motions for directed verdict on Intertel's Count I, Count V, and Count VI. Since those three counts were the only ones that sought punitive damages, their dismissal nullified the trial court's error. Once the court dismissed all of Intertel's counts seeking punitive damages, the jurors' views regarding punitive damages became irrelevant, unlike in *Ashcroft.* The court in *Ashcroft* reasoned that it was reasonable to infer that some of the jurors could have been biased or prejudiced against the concept of punitive damages, therefore the trial court committed reversible error. *Id.* at 508. Since the issue of punitive damages became moot when the trial court dismissed Counts I, V, and VI, Intertel cannot prove that it suffered any prejudice. Therefore, Intertel is not entitled to a new trial on this point on appeal. Point denied.

## IV. *Directed Verdicts*

Directing a verdict is a drastic remedy and we will not reverse the trial court's grant of a directed verdict unless the facts and any inferences therefrom are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to the result. *Thong v. My River Home Harbour, Inc.,* 3 S.W.3d 373, 377 (Mo.App. E.D.1999). The plaintiff may prove essential facts by circumstantial evidence as long as the facts proved and the conclusions to be drawn are of such a nature and are so related to each other that the conclusions may be fairly inferred. *Schumacher v. Barker,* 948 S.W.2d 166, 168 (Mo.App. E.D.1997).

In reviewing a trial court's judgment granting a motion for directed verdict, we must determine whether the plaintiff made a submissible case, i.e., whether the plaintiff introduced substantial evidence at trial that tends to prove the essential facts for his or her recovery. *Dunn v. Enterprise Rent–A–Car Co.,* 170 S.W.3d 1, 3 (Mo.App. E.D.2005). We view all the evidence in the light most favorable to the plaintiff, giving him or her the benefit of all reasonable inferences, and disregarding the defendant's evidence except to the extent that it aids the plaintiff's case. *Id.* A presumption is made in favor of reversing the trial court's grant of a directed verdict unless the facts and any inferences from those facts are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to the result. *Friend v. Holman,* 888 S.W.2d 369, 371 (Mo.App. W.D.1994). When a directed verdict is granted at the close of the plaintiff's opening statement, we review the petition and the opening statement to determine whether the plaintiff made a submissible case. *Giles v. American Family Life Ins. Co.,* 987 S.W.2d 490, 493 (Mo. App. W.D.1999). In reviewing the suffi-

ciency of the petition and the opening statement, both should be construed broadly. *Id.*

## A. Morgan and MJM Directed Verdicts After Opening Statement—Count I, III, IV

In its fifth point on appeal, Intertel claims that the trial court erred in directing and entering a verdict as to the conspiracy claims against Morgan and MJM (Count I), the breach of contract claim against Morgan (Count III) and the breach of contract claim against MJM (Count IV) at the close of Intertel's opening statement. First, Intertel claims that the trial court erred in refusing its request for an opportunity to amend its opening statement. Second, Intertel argues that its opening statement together with its Petition were sufficient to make a submissible case.

By earlier rulings, the trial court restricted Intertel's opening statement, prohibiting all evidence concerning the SIU Manual, Intertel's claim that SCMS was required to refer all of its investigative business to Intertel and references to punitive damages. After Intertel's opening statement, MJM and Morgan moved for a directed verdict on Intertel's conspiracy and breach of contract claims against them. MJM and Morgan noted that Intertel failed to refer to any breach of contract or conspiracy related to them and that under Missouri law, a directed verdict was proper. The court then granted the motions for directed verdict, thus eliminating all claims against MJM and Morgan. After granting directed verdicts as to the counts against MJM and Morgan (Counts I, III, and IV), the trial continued solely on Intertel's claims against SCMS.

▮ The primary purpose of an opening statement is not to test the sufficiency of plaintiff's anticipated evidence, but to inform the judge and the jury in a general way of the nature of the action so as to enable them to understand the case and to appreciate the significance of the evidence as it is presented. *Hays v. Missouri Pac. R.R. Co.*, 304 S.W.2d 800, 804 (Mo.1957). Generally, "courts should be reluctant to direct a verdict at the close of plaintiff's opening statement." *Giles*, 987 S.W.2d at 493. To do so is "highly unusual and rarely justified." *Id.* This is because the opening statement is merely an outline, not a detailed statement, of the anticipated proof. *Id.* As such, counsel is neither expected nor required to recite every detail of evidence to be offered. *Id.*

### 1. Amending Opening Statement

First, Intertel claims that even if its opening statement and Petition were insufficient, it should have been given the opportunity to amend its opening statement.

After Baris concluded his opening statement on behalf of Intertel, the following conversation occurred at the bench:

MJM's attorney Charles E. Reis ("Reis"): Judge, it's a very unusual move, but it's one that's recognized by Missouri law in very unusual circumstances. I am going to move for a directed verdict at the close of Plaintiff's statements because my Defendant—his opening statement referred to no breach by MJM of the contract, and he indicated no evidence that related to any conspiracy on the part of MJM in furtherance of driving Intertel out of business.

There was nothing that was said with—there's only two counts against us: breach of contract and conspiracy, and he didn't say anything—that we did anything wrong during any of his opening statement . . .

Baris: Your Honor, I referred to the contract with MJM which I said would

be in evidence and would show the restrictions about competition and use of their Intertel material. I think that's embraced within my opening statement. *If you feel it isn't, then I would ask an opportunity to continue and focus directly on that part of the case. I thought it would be covered by the general statements that I made about the participation in this conspiracy.* (emphasis added).

Court: Mr. Baris, I think the only thing you mentioned regarding MJM was the fact that there was a vendor contract . . .

Baris: *Then I would ask leave to make a further statement on that part of it, your Honor.* (emphasis added).

Court: I'm going to grant your [MJM's] motion.

Morgan's attorney Jeffrey D. Sigmund ("Sigmund"): Judge, I'm going to make a similar motion with respect to Lori Morgan. There was reference to a noncompete, and there was reference to restrictions of what she could or couldn't do. We never heard anything more about the breach of contract.

All we heard was she made some allegation or some representation that [she] may have induced Intertel to release her from their [sic] noncompete, but that's all we heard, and that's not been pled. There's no evidence here for fraud or fraudulent inducement. The wrongful inducement is against Sedgwick.

Baris: Judge, I mentioned that the inducements were made by both Morgan and [SCMS] to cause them to give up on the restrictive covenant.

Court: I'll grant the motion regarding Lori Morgan.

Sigmund: Judge, to the same extent—

Baris: Judge, excuse me. *I would then request an opportunity at this point to expand on that.* (emphasis added).

Court: *I'm not going to allow that.* (emphasis added).

After granting directed verdicts as to the counts against MJM and Morgan (Counts I, III, and IV), the trial continued solely on Intertel's claims against SCMS.

▮ The action of directing a verdict after the opening statement should be taken only after counsel has been given the opportunity, after the motion for directed verdict has been made, to correct or add to the opening statement. *Dotson*, 932 S.W.2d at 884. The trial court's action of directing a verdict for a defendant should be taken with caution and should be taken only when it affirmatively appears that a plaintiff's case has been fully stated and after counsel has been afforded an opportunity, after the motion for directed verdict has been made, to correct or add to his opening statement. *Hays*, 304 S.W.2d at 804–805. The trial court should always ascertain definitely if the opening statement as made embraces the entire anticipated proof. *Id.*

▮ We find that the trial court erred because it failed to provide Intertel with the opportunity to correct or add to its opening statement before granting MJM and Morgan's motion for a directed verdict. The court did not ascertain definitely whether the opening statement embraced the entire anticipated proof. At the bench, Intertel's counsel made three requests to amend and expand his opening statement regarding his civil conspiracy claim against Morgan and MJM. The court denied his requests. The court should have given Intertel's counsel the opportunity to expand his opening argument before granting MJM's and Morgan's motions for directed verdict.

Although the trial court should have provided Intertel with the opportunity to expand or amend its opening statement

before granting Morgan's and MJM's motions for directed verdict, Intertel nonetheless failed to state in its brief what additional facts it would have included in its opening statement had the court given it the opportunity to amend its opening statement. In *Swindler v. Butler Mfg. Co.*, the Missouri Supreme Court affirmed the trial court's dismissal of plaintiff's claim after a deficient opening statement where the plaintiff failed to specifically identify what evidence would have been offered. 426 S.W.2d 78, 84 (Mo.1968). In *Swindler*, the plaintiff "advanced no showing of what proof he might have offered in addition to that contained in his opening statement." *Id.* Similarly, Intertel failed to make an offer of proof before the trial court. Further, Intertel advanced no additional offers of proof in its appellate brief of what it might have offered in addition to that contained in its opening statement. Even when Intertel's counsel asked to expand on the opening statement, he failed to specify how he intended to expand or what additional offers of proof he intended to present.

### 2. Submissible Case

Intertel also argues that it asserted facts which, if proved, would result in a submissible case regarding its conspiracy claim against MJM and Morgan (Count I), its breach of contract claim against Morgan (Count III) and its breach of contract claim against MJM (Count IV). As such, Intertel claims that the trial court erred in granting MJM and Morgan's motion for directed verdict after its opening statement.

■ Usually a trial court may direct a verdict at the close of plaintiff's opening statement in two situations:

(1) when counsel makes an admission which affirmatively demonstrates as a matter of law that plaintiff has no cause of action or is not entitled to recover on his cause of action, or

(2) where the facts recited in the opening statement, if proved, do not, as a matter of law, constitute enough to make a submissible case to go to the jury.

*Dotson v. Hammerman*, 932 S.W.2d 880, 883 (Mo.App. E.D.1996).

■ The second situation is limited, though, because the mere insufficiency of the opening statement to recite facts which show that plaintiff's anticipated evidence would, as a matter of law, present a submissible case, is not, standing alone a sufficient justification to stop the case at that stage and direct a verdict for the defendant. *Id.* In that situation, a directed verdict for defendant is appropriate only when it affirmatively appears that the whole of plaintiff's case has been fully and completely set forth in the opening statement and it clearly appears, as a matter of law, that proof of the recited facts, together with all reasonable inferences in plaintiff's favor, would not result in a submissible case. *Id.* at 883–84.

■ Since Intertel never made an admission which affirmatively demonstrated as a matter of law that it had no cause of action or was not entitled to recover on its cause of action, the second situation, concerning whether Intertel asserted facts which, if proved, constituted a submissible case, is applicable here. Intertel made breach of contract claims against Morgan (Count III) and MJM (Count IV). To make a submissible case for breach of contract claim, a plaintiff must allege and prove: (1) a mutual agreement between parties capable of contracting; (2) mutual obligations arising out of the agreement; (3) valid consideration; (4) part performance by one party; and (5) damages resulting from the breach of contract. *Nor-*

*ber v. Marcotte,* 134 S.W.3d 651, 658 (Mo. App. E.D.2004).

■ Intertel also asserted a claim of civil conspiracy against MJM and Morgan in Count I. To establish a claim of civil conspiracy, a party must prove: (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) the plaintiff was thereby damaged. *Oak Bluff Partners v. Meyer,* 3 S.W.3d 777, 780–81 (Mo.1999); *Creative Walking, Inc. v. Am. States Ins. Co.,* 25 S.W.3d 682, 688 (Mo.App. E.D. 2000).

■ Intertel failed to assert facts in its opening statement which, if proved, would result in a submissible case for both its breach of contract and conspiracy claims against MJM and Morgan. During the opening statement, counsel for Intertel barely mentioned MJM and Morgan. When counsel first mentioned MJM, he merely stated that MJM signed a vendor contract. He also stated, near the end of his opening, "The events that I've outlined to you relate to all of the counts, but I've set them out primarily because of the count that we are suing on for the conspiracy; to show that Sedgwick, Morgan and MJM entered into this conspiracy, got the personal records, got the key employee, changed the SIU, and did so based upon a number of misrepresentations to Intertel. . . ." Therefore, in its opening statement Intertel failed to present facts which, if proved, would establish the elements for breach of contract and conspiracy against Morgan and MJM.

Additionally, Intertel's Petition failed to assert facts which, if proved, could constitute a submissible case against Morgan and MJM for civil conspiracy. Regarding the conspiracy claim against Morgan and MJM (Count I), Intertel's Petition does not even allege that there was a meeting of

minds to commit an unlawful objective by either Morgan or MJM. Had Intertel's counsel been allowed to amend his opening statement, we find no evidence to support that the trial court would have erred in directing a verdict as to the conspiracy claim against Morgan and MJM. Since neither Intertel's Petition nor its opening statement made a submissible case against Morgan or MJM on the civil conspiracy claim, the trial court correctly granted Morgan's and MJM's motions for directed verdict on Count I.

■ On the other hand, regarding its breach of contract claims against Morgan (Count III) and MJM (Count IV), Intertel's Petition asserted sufficient facts which, if proved, would result in a submissible case. Although Intertel's opening statement does not contain allegations which, if proved, would be sufficient to establish a submissible case, Intertel's Petition does. The Petition sets forth all five elements necessary to prove Count III and IV. In both counts Intertel asserted that there was a mutual agreement, mutual obligations arising out of the agreement, valid consideration, part performance by one party, and resulting damages from the breach of contract. We find that Intertel's opening statement and Petition, interpreted together, as they stand, asserted sufficient facts which, if proved, would result in a submissible case regarding the breach of contract claim against Morgan and MJM. Therefore, the trial court erred in granting Morgan's and MJM's motions for directed verdict on Intertel's breach of contract claims against them. Accordingly, we reverse on this portion of the point only.

## B. SCMS Directed Verdict—Count I

■ In its sixth point on appeal, Intertel claims that the trial court erred in directing a verdict at the close of Intertel's

case against SCMS on the conspiracy claim (Count I) after making a submissible case.[7] Intertel alleges that Defendants entered into a civil conspiracy to drive Intertel out of business. Specifically, Intertel alleges that SCMS embarked on a campaign to take over Intertel's business activities after utilizing purportedly sensitive information SCMS received from its due diligence in January 2001.

To make a submissible case of civil conspiracy, a party must establish: (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and, (5) the plaintiff was thereby damaged. *Oak Bluff Partners*, 3 S.W.3d at 780–81; *Creative Walking, Inc.*, 25 S.W.3d at 688. The conspiracy itself is not actionable; the unlawful act done in pursuance thereof is actionable, and the conspiracy has to do only with the joint and several liability of the co-conspirators. *Preferred Physicians Mut. Mgmt. Group v. Preferred Physicians Mut. Risk Retention*, 918 S.W.2d 805, 815 (Mo.App. W.D.1996). The unlawful acts done in pursuit of a conspiracy give rise to the action. *Roth v. La Societe Anonyme Turbomeca France*, 120 S.W.3d 764, 778 (Mo.App. W.D.2003). Proving the conspiracy concerns only the co-conspirators' liability as joint tortfeasors. *Id.* For a submissible case that SCMS conspired with Morgan and MJM, Intertel must prove: (1) two or more of the Defendants; (2) with an unlawful objective; (3) after a

meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and, (5) Intertel was thereby damaged. *See Oak Bluff Partners*, 3 S.W.3d at 780–81.

After reviewing the record, we cannot say that Intertel satisfied all five elements of its civil conspiracy claim against SCMS. In particular, Intertel failed to establish that there was an unlawful purpose and that the Defendants reached a meeting of the minds. Intertel produced no evidence at trial to satisfy all elements of its civil conspiracy claim. Instead, Intertel relies on its allegations in its Petition to support its claim.

In its case in chief, Intertel only presented testimony from two of its officers during the period of time at issue here: Kevin DeRossett, Intertel's president and John T. Clarkson, Jr., Intertel's treasurer at the time. The testimony from those witnesses did not establish a conspiracy. In addition, Intertel did not introduce testimony from Morgan or anyone from MJM. Even assuming arguendo that Intertel was correct in claiming that some of SCMS's actions were unlawful,[8] its civil conspiracy claim would ultimately fail because it never produced evidence that there was a meeting of the minds. No evidence was introduced to establish that any two of the Defendants involved in the alleged civil conspiracy met, negotiated, and more importantly, achieved a meeting of the minds to carry out some unlawful

---

7. SCMS, unlike Morgan and MJM, did not move for directed verdict on the conspiracy claim (Count I) after Intertel's opening statement. Instead, SCMS moved for directed verdict at the close of Intertel's case against SCMS.

8. In its Petition, Intertel alleges that Morgan unlawfully made fraudulent representations to Intertel that invalidated the waiver of her non-compete clause. Intertel claims that

MJM violated its contract with Intertel by breaching a restrictive agreement with Intertel about the use of Intertel's confidential programs. Regarding SCMS, Intertel first claims that SCMS committed an unlawful act by partially terminating the Service Agreement without Intertel's signature. Second, Intertel alleges that SCMS unlawfully terminated the remainder of the Service Agreement without providing sixty days' notice.

purpose. Therefore, the trial court properly directed a verdict for SCMS at the close of Intertel's evidence on Count I for civil conspiracy. Point denied.

## C. SCMS Directed Verdicts—Counts V, VI

In its seventh point on appeal, Intertel claims that the trial court erred in directing a verdict for SCMS at the close of Intertel's evidence on Counts V (for inducing Morgan to breach her contract with Intertel) and VI (for inducing MJM to breach its contract with Intertel). Intertel claims that it made a submissible case, in that the evidence and inferences viewed most favorably to Intertel showed that SCMS knowingly and without justification induced and caused Morgan and MJM to breach their contracts with Intertel.

 The cause of action for intentional interference with performance of a contract by a third person is described as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Howard v. Youngman*, 81 S.W.3d 101, 112 (Mo.App. E.D.2002) (quoting RESTATEMENT (Second) OF CONTRACTS Section 766 (1979)). The elements of a claim of tortious interference with contract are: (1) a contract; (2) defendant's knowledge of the contract; (3) intentional interference by the defendant inducing or causing a breach of the contract; (4) absence of justification; and (5) damages resulting from defendant's conduct. *Howard*, 81 S.W.3d at 112–13.

Regarding Count V and VI, Intertel failed to cite to any trial evidence that satisfies all five elements of its tortious interference claims against SCMS. For a submissible case that SCMS tortiously interfered with Morgan's and MJM's contracts with Intertel, Intertel must prove: (1) the existence of a contract; (2) SCMS's knowledge of the contract; (3) that SCMS induced or caused the breach of the contract; (4) that SCMS's acts were not justified; and (5) Intertel suffered damages. *See id.*

 Intertel fails to cite to evidence demonstrating that it satisfied all elements of its tortious interference claim in Count V. Although Intertel provided evidence that under the contract, Morgan could not disclose information she obtained while working for Intertel, Intertel provided no evidence that Morgan actually disclosed information, consequently breaching her contract. Also, Intertel provided no evidence during trial that SCMS induced Morgan to breach her contract. Since Intertel failed to prove essential elements of tortious interference by SCMS of Morgan and Intertel's contract, Intertel failed to put forth a submissible case. Therefore, the trial court did not err in directing a verdict for SCMS regarding Count V after Intertel's close of evidence.

 Similarly, Intertel fails to cite to evidence demonstrating that it satisfied all five elements of its tortious interference claim concerning Count VI (tortious interference of Intertel's contract with MJM). First, during the trial, Intertel did not produce any evidence that SCMS had knowledge of MJM's contract with Intertel. Furthermore, Intertel did not introduce evidence that SCMS induced MJM to breach its contract. The pages of the transcript that Intertel cites in its brief to support inducement in fact merely discuss when Intertel learned that MJM would

become SCMS's new SIU. There was no evidence of inducement. Since Intertel failed to establish essential elements of its inducement to breach claim against SCMS regarding MJM (Count VI), the trial court did not err in directing a verdict for SCMS after Intertel's close of evidence.[9] Point denied.

## V. *Jury Instructions*

### A. Instruction 7A

Intertel claims, in its final point on appeal, that the trial court erred in refusing to submit Intertel's proffered Instruction 7A. It claims that the trial court abused its discretion by submitting SCMS's Instruction 7 based on MAI 26.02 [2002] [10] instead of Intertel's Instruction 7A based on MAI 26.02 [2002]. Intertel claims that each factual basis contained in its proffered instruction was supported by substantial evidence.

At the instruction conference, Intertel proffered the following Instruction 7A:

Your verdict must be for plaintiff Intertel, Inc. if you believe:

First, defendant [SCMS] did not make payments of money due to plaintiff, *or* failed to comply with its contract with plaintiff but instead attempted to change its contract with plaintiff, *or* attempted to replace plaintiff as it special investigative unit, *or* attempted to terminate its contract with plaintiff, and

Second, because of such failure, defendant [SCMS's] contract obligations were not performed, and

Third, plaintiff was thereby damaged, unless you believe that plaintiff is not entitled to recover by reason of Instruction Number _____.

(emphasis added). The instruction submitted four alternative factual bases on Intertel's breach of contract claim. The trial court rejected Intertel's instruction and instead submitted SCMS's submitted Instruction 7, which had only one factual basis. Instruction 7 stated the following:

Your verdict must be for Intertel if you believe:

First, [SCMS] did not make payments of amounts due under the agreement, and

Second, because of such failure, [SCMS's] contract obligations were not performed, and

Third, Intertel was thereby damaged.

Unless you believe that Intertel is not entitled to recover by reason of Instruction Number 8.

During the instruction conference, Intertel objected to the trial court's submission of SCMS's Instruction 7 and its refusal to give Instruction 7A.

First, Intertel's proposed instruction stated that the jury should find for Intertel if it believed that SCMS did not make payments of money due to Intertel. Since

---

**9.** Since we are reversing on Intertel's fifth point on appeal, in the new trial Intertel will be able to introduce evidence that MJM breached its contract with Intertel, an essential element of tortious inference. Although Intertel may be able to prove that MJM breached its contract with Intertel from the evidence provided at trial, Intertel still failed to prove other essential elements of tortious interference. Therefore, the trial court did not err in granting SCMS's motion for directed verdict for Counts V and VI.

**10.** MAI 26.02 [2002] states the following:

Your verdict must be for plaintiff if you believe:
First, defendant did not (*here insert the nature of the breach* ), and
Second, because of such failure, defendant's contract obligations were not performed, and
Third, plaintiff was thereby damaged.

this factual basis was incorporated into Jury Instruction Number 7, it is not at issue here.

■ The next factual basis in Intertel's proposed instruction was that the jury should find for Intertel if it believed "SCMS failed to comply with its contract with plaintiff but instead attempted to change its contract with plaintiff." The Service Agreement states that "[t]his Agreement may be amended, but then only in a written addendum to this Agreement executed by the parties." SCMS may have made unilateral attempts to amend the Service Agreement, but such attempts are not substantial evidence that SCMS breached its contract with Intertel. Attempts to amend a contract are not sufficient to demonstrate a breach of contract. Therefore, the trial court could reject Intertel's proposed instruction on this factual basis alone.

■ Also, Intertel's proposed instruction stated that SCMS breached its contract by "attempt[ing] to replace plaintiff as its special investigative unit." Nothing in the Service Agreement prohibited SCMS from replacing or attempting to replace Intertel as the SIU. The Service Agreement provided that with proper notice, either party could terminate the agreement at any time and for any reason. The Service Agreement states that the agreement would continue "until terminated by either party upon sixty (60) days prior written notice." David A. North, SCMS's president, wrote a letter to Kevin DeRossett, Intertel's president stating, "Please be advised that this letter serves as official notice that [SCMS] is canceling part of the investigative services that have been provided by [Intertel] to [SCMS's] clients." By providing this letter, SCMS terminated Intertel as the SIU in a method that complied with the Service Agreement. As such, the trial court could reject

Intertel's proposed instruction on this factual basis, as well.

Finally, in its proffered instruction, Intertel stated that SCMS breached its contract with Intertel by attempting to terminate its contract with plaintiff. Much like the factual basis mentioned above, the Service Agreement explicitly permitted either party to terminate the agreement. Intertel's proffered instructions would have permitted the jury to find that SCMS breached the Service Agreement by acting in a manner expressly permitted by the agreement. Therefore, as with the other factual bases proffered by Intertel in Instruction 7A, the trial court did not abuse its discretion in rejecting this factual basis because the instruction was not supported by substantial evidence. Point denied.

## B. Instruction 12 (SCMS's Cross-Appeal)

■ In its cross-appeal, SCMS claims that the trial court erred in using Instruction 12 because it was an affirmative converse instruction that did not defeat SCMS's counterclaim even if it were true. Instead, Instruction 12 permitted the jury to find that Intertel did not breach its contract if it safeguarded money to be remitted to SCMS without addressing SCMS's claim that Intertel breached its contract by failing to safeguard fees to be paid to vendors. We agree.

■ In reviewing an instruction, this court views the evidence and the inferences in the light most favorable to the instruction and disregards contrary evidence. *Missouri Dep't of Transp. ex rel. P.R. Developers, Inc. v. Safeco Ins. Co. of Am.*, 97 S.W.3d 21, 31 (Mo.App. E.D.2002). We will reverse on instructional error only where the instruction misled, misdirected, or confused the jury, and the instruction resulted in prejudicial error. *Id.* In deter-

mining whether an instruction given at the request of a defendant is supported by the record, we must consider the evidence in the light most favorable to the defendant, together with all favorable and reasonable inferences to be drawn therefrom. *Hiller v. Diestelhorst*, 820 S.W.2d 522, 524 (Mo. App. E.D.1991).

SCMS's breach of contract counterclaim alleged that Intertel violated the Service Agreement by improperly retaining money paid by SCMS that was due to vendors for services rendered. The Service Agreement states, "Intertel shall safeguard *all* monies which are received from SCMS or the Clients as payment for Services rendered and shall remit to SCMS its fee within 15 days following the close of each calendar month from such monies received . . . ." (emphasis added). Under the agreement, Intertel was to distribute money it received from SCMS to the vendors for services rendered. SCMS alleged that Intertel retained that money and never paid nor returned it to SCMS. SCMS claimed that Intertel's conduct exposed SCMS to double liability and caused some vendors to stop conducting business with SCMS.

During trial, SCMS offered Jury Instruction Number 11 ("Instruction 11"), which the court accepted and utilized. The instruction stated:

Your verdict must be for [SCMS] if you believe:

First, Intertel did not safeguard the money it received from [SCMS] for services rendered, and

Second, because of such failure, Intertel's contract obligations were not performed, and

Third, [SCMS] was thereby damaged.

Unless you believe that [SCMS] is not entitled to recover by reason of Instruction Number 12.

Over SCMS's objection, the trial court accepted and utilized Intertel's converse Instruction 12, which stated:

Your verdict must be for Intertel under Instruction No. 11 if you believe:

First, Intertel safeguarded the money it received from [SCMS] for payments back to [SCMS] for fees due to [SCMS], *or*

Second, Intertel performed its contract obligations.

(emphasis added). SCMS claims that the word "or" in the affirmative converse Instruction 12 was prejudicial error because it was not sufficient in law to defeat SCMS's entire counterclaim against Intertel.

■■■■■ Plaintiffs' verdict directing instructions may be conversed in two ways—either as a true converse or as an affirmative converse. MAI 33.01 [2002]. A true converse instruction begins with "Your verdict must be for defendant unless you believe" followed by one or more propositions submitted by the verdict directing instruction and in substantially the same language used in the verdict directing instruction. *Id.* A true converse instruction requires no independent evidence to support it. *Id.* It is a device used by the defendant to emphasize one or more of the elements of the case upon which the plaintiff has the burden of proof. *Id.*

■■■■■ An affirmative converse instruction begins with "Your verdict must be for defendant if you believe" followed by a hypothesized ultimate issue which, if true, would defeat plaintiff's claim. *Id.* Use of this form requires independent evidence to support it. *Id.* However, unlike a true converse instruction, there *is* a requirement that the verdict director contain a phrase, commonly referred to as an "affirmative defense" tail, which refers the jury directly from the verdict director to

the affirmative converse instruction. *Id.* The facts hypothesized in an affirmative converse instruction must be sufficient in law to defeat the plaintiff's claim. *Id.* A defendant may submit his theory of the case through the use of an affirmative converse instruction. *Hiller*, 820 S.W.2d at 524. However, he must then produce independent evidence supporting those facts submitted in the instruction and the facts must be sufficient in law to defeat plaintiff's claim. *Id.* Since Instruction 12 includes the phrase "if you believe" and is followed by a hypothesized ultimate issue, which, if true, would defeat SCMS's claim, it is an affirmative converse instruction.

In *Hiers v. Lemley*, the Missouri Supreme Court analyzed why the affirmative converse verdict directing jury instructions are disfavored in Missouri. 834 S.W.2d 729 (Mo. banc 1992). An affirmative converse instruction is often merely a resubmission of the issues found in the verdict director. *Id.* at 735. It requires evidentiary support to justify its submission. *Id.* at 735–36. In addition, it has the propensity to violate the general premise of the approved instruction format by including unnecessary evidentiary details instead of the ultimate issues. *Id.* at 736. These potential problems have led some experts to squarely advise, "Do not use the affirmative converse instruction." *Id.*

The problem with Instruction 12 is that the facts stated therein, if true, would not defeat SCMS's counterclaim that the Service Agreement required Intertel to safeguard *all* the money SCMS sent it—money to be remitted to SCMS for fees and money to be paid to vendors. Intertel, on the other hand, claimed that the Service Agreement required it to safeguard only the money that would be remitted to SCMS for fees. Intertel's Instruction 12 does not include SCMS's claim related to vendors. As written, a jury could find

Intertel not liable for breach if it found that Intertel safeguarded just the money it received from SCMS for payments back to SCMS for fees without considering SCMS's claim related to vendors. Therefore, Instruction 12's hypothesized ultimate issue was not sufficient to defeat SCMS's entire counterclaim.

*Hiller* is on point. In *Hiller*, the plaintiff brought a malpractice action against the defendant, a physician, for failure to diagnose an artery disease that resulted in plaintiff's stroke. *Id.* at 523. The defendant submitted an affirmative converse instruction stating that if the jury found that the plaintiff's stroke occurred because she failed to tell him about her symptoms, it should find for the defendant. *Id.* The plaintiff appealed a verdict in the defendant's favor, claiming that the jury could find that the plaintiff failed to tell defendant about her symptoms, yet still find that the defendant was negligent in failing to diagnose her disease. *Id.* at 524. This court agreed with the plaintiff, holding that the facts in defendant's affirmative converse instruction "were not sufficient in law to defeat plaintiff's claim." *Id.* The court held that even though her failure to tell the defendant her symptoms may have led the jury to rule for the defendant, "it had no place in an affirmative converse instruction in this case, because it does not defeat [p]laintiff's claim if true. *Id.*

Much like *Hiller*, Instruction 12 did not defeat SCMS's entire counterclaim if true. The jury in the instant case could have found that Intertel safeguarded the money to be sent back to SCMS for fees, but did not safeguard the money to be sent to vendors. By doing so, the jury could find for Intertel even if Intertel did not safeguard the money to be sent to vendors. As written, Instruction 12 was not sufficient in law to defeat SCMS's entire claim.

Therefore, we reverse and remand on this point.

### Conclusion

The trial court erred in prohibiting Intertel from introducing the SIU Manual into evidence and further erred in submitting Instruction 12 because it was an affirmative converse instruction that did not defeat SCMS's entire breach of contract counterclaim against Intertel even if it were true; therefore the judgment in favor of Intertel on its breach of contract claim against SCMS (Count II) is reversed. In addition, the court erred in granting Morgan's and MJM's motions for directed verdict on Intertel's breach of contract claims; therefore the judgment in favor of Morgan (Count III) and MJM (Count IV) is reversed. The judgment on Counts II, III and IV and SCMS's breach of contract counterclaim is hereby reversed and remanded for a new trial. In all other respects, the judgment is affirmed.

ROBERT G. DOWD, JR., J., and SHERRI B. SULLIVAN, J., concur.