IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT

 SAINT LUKE’S HOSPITAL OF )
 KANSAS CITY, )
 )
 Appellant-Respondent, )
 WD83388
 v. )
 (Consolidated with WD83418,
 )
 WD83420, and WD83425)
 )
 BENEFIT MANAGEMENT )
 OPINION FILED:
 CONSULTANTS, INC., CARTHAGE R-9 )
 April 13, 2021
 SCHOOL DISTRICT, and GERBER )
 LIFE INSURANCE COMPANY, )
 )
 Respondents-Appellants. )

 Appeal from the Circuit Court of Jackson County, Missouri
 The Honorable Joel P. Fahnestock, Judge

 Before Division Four: Cynthia L. Martin, Chief Judge, and
 Thomas H. Newton and Mark D. Pfeiffer, Judges

 Saint Luke’s Hospital of Kansas City (“St. Luke’s”) appeals from the judgments/orders of

the Circuit Court of Jackson County, Missouri (“trial court”), granting the motions for summary

judgment filed by Benefit Management Consultants, Inc. (“BMI”), Gerber Life Insurance

Company (“Gerber”), and Carthage R-9 School District (“Carthage”) (collectively, “Defendants”),

and the motion for judgment on the pleadings filed by BMI in St. Luke’s action for breach of

contract, promissory estoppel, unjust enrichment, and violation of Missouri’s Prompt Payment
Act. BMI, Gerber, and Carthage cross-appeal. This Court ordered the appeals consolidated. We

affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

 Factual and Procedural Background1

 John Doe2 worked for Carthage and was covered under Carthage’s self-funded Carthage

R-9 School District Employee Health Care Plan (“Carthage Plan” or “Plan”). He suffered from

heart failure and was initially treated in Joplin, Missouri. When Doe’s condition progressed, his

healthcare providers recommended that Doe be transferred to St. Luke’s in Kansas City for further

evaluation and treatment. Doe’s transfer out of the area was approved based on his doctor’s

recommendation because his condition and treatment were highly specialized and required a

higher level of care than was available in southwest Missouri.

 The Carthage Plan specified to its members that it utilized a “Preferred Provider Network”:

 In an effort to better control costs and promote quality service, the Plan is
 participating in a discount program. Employees and their dependents are given the
 opportunity to utilize physicians and hospitals who have contracted with the Plan,
 also called in-network providers. The Plan member may choose to use an
 in-network provider or an out-of-network provider. However, if the Plan member
 utilizes an in-network provider, the Plan will pay at a higher benefit percentage than
 if the member were to see an out-of-network provider. A directory of hospitals and
 physicians in your area who have agreed to handle billing and collections for the
 patient will be made available to the Plan member through the Plan Administrator’s
 Benefits’ Office or can be obtained from the Plan Supervisor. The Plan member’s
 personal identification card will notify the provider of membership in the program.

The Plan would pay 80% or more of most in-network services and 40% for most out-of-network

services. The Plan defined a “network provider” for its members as:

 any provider having a contractual relationship with the plan at the time treatment,
 care, services or supplies are provided. This will include any provider that
 negotiates with Benefit Management, Inc. before or after services are rendered.
 BMI negotiations will always be paid at the PPO level of benefits. A network

 1
 The facts, and the reasonable inferences that can be drawn therefrom, are set forth in the light most favorable
to St. Luke’s, as the party against whom summary judgment was entered. See ITT Commercial Fin. Corp. v. Mid.-Am.
Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993).
 2
 A pseudonym is used in this opinion to protect the individual’s anonymity and his and his family’s privacy.

 2
 provider may also include any provider who is contracted with one of BMI’s
 national wrap-around PPO’s if allowed by the plan as stated on page 1.

 BMI began acting as the third-party administrator for the Carthage Plan on or about July 1,

1999. BMI’s services on behalf of the Plan were governed by an Administrative Services

Agreement (“ASA”). The ASA between Carthage and BMI authorized BMI to perform certain

administrative functions on behalf of the Carthage Plan, including “[c]laim verification and

payment,” preparation of “ID cards,” and “[g]uidance in Plan arrangement.” The ASA instructed

BMI to “pay all claims which it has determined to properly qualify under the terms of The Plan

without additional consent from [Carthage].” As third-party administrator of the Carthage Plan,

BMI received, processed, and paid claims on behalf of the Plan.

 The ASA also granted BMI “the authority to negotiate discounts . . . itself or through a

designated agent.” On or about June 1, 2012, BMI entered into a Client Services Agreement

(“CSA”) with MultiPlan, Inc. (“MultiPlan”). A “national wrap-around PPO” is a group of

providers who contract with an entity to provide services at a discounted price. MultiPlan

maintained a network of healthcare providers for its clients and entered into contracts with

healthcare providers who agreed to provide “certain healthcare services at certain negotiated

rates.” St. Luke’s was a provider within the MultiPlan Provider Network. Doe’s insurance card

was branded with a MultiPlan logo and instructed healthcare providers to submit claims to BMI

for processing and payment.

 Carthage contracted with Gerber for an Excess Loss Insurance Policy, also called a

stop-loss policy, in order to mitigate the financial risks associated with maintaining a self-insured

health plan. Gerber agreed to reimburse Carthage for large medical expense losses incurred by

 3
Carthage members under the Carthage Plan, subject to the terms and conditions of the stop-loss

policy.3

 Doe presented at St. Luke’s with a health insurance card that identified his Group Medical

Plan as the Carthage Plan and his third-party administrator as BMI, and directed St. Luke’s to

submit claims for services rendered to Doe to BMI. St. Luke’s was aware that Doe’s ID card

indicated that BMI was accessing the MultiPlan network as a wrap-around network. On each of

the dates of treatment, Doe executed a form titled “St. Luke’s Health System Consent and

Agreement of Health Care Services,” which contained a section titled “ASSIGNMENT OF

BENEFITS.”

 St. Luke’s provided healthcare services to Doe over the course of fifteen separate

admissions from June 3, 2014, through January 6, 2015. At the time of Doe’s treatment, St. Luke’s

utilized the clearinghouse RelayHealth to transmit claims to payors. A clearinghouse is a

third-party intermediary that contracts with both providers and payors to facilitate the transmission

of claims for payment from healthcare providers to healthcare payors. All of St. Luke’s claims

were submitted to RelayHealth in the standardized 837 electronic format. Per BMI’s instructions,

RelayHealth converted the electronic claims submitted by St. Luke’s in the 837 format to paper

UB-04 claims4 before transmission to BMI. Separate and apart from the transmission through

RelayHealth, St. Luke’s also submitted its claims directly to BMI by facsimile.

 3
 “Stop-loss coverage is defined as indemnity coverage issued to an employer maintaining a self-funded
health plan to reimburse the employer for large medical expense losses incurred by the employees protected by the
plan.” Fidelity Sec. Life Ins. Co. v. Dir. of Revenue, 32 S.W.3d 527, 530 (Mo. banc 2000) (internal quotation marks
omitted). “By definition, stop-loss coverage is a form of health insurance. Employers are directly reimbursed under
stop-loss policies for employee healthcare expenses above the expected amount of claims.” Id. “Stop-loss coverage
prevents employees from bearing the burden of large healthcare claims that could plunge an employer, especially a
small employer, into financial devastation.” Id. “Employers who self-fund healthcare insurance use this coverage not
only to protect themselves but also to protect the jobs and healthcare benefits due their employees in the event of a
catastrophic loss.” Id.
 4
 The UB-04 is the Uniform Bill approved by the National Uniform Billing Committee, to translate 837 data
to paper.

 4
 Consistent with BMI’s affirmative assurances to Doe and St. Luke’s that St. Luke’s

qualified as an “in-network” provider, BMI paid St. Luke’s at the in-network benefit level under

the Carthage Plan for healthcare services rendered to Doe during his first three admissions. The

first three admissions covered dates of services from June 3, 2014, to July 2, 2014, and the claim

payment checks were drawn on Carthage’s bank account and signed by BMI. Those first three

admissions are not at issue in this appeal, but Doe’s remaining twelve admissions are.5 Upon each

admission, BMI affirmatively advised St. Luke’s that St. Luke’s was an in-network provider under

the Carthage Plan and would be reimbursed at the MultiPlan contract rates.

 After the third admission, Doe’s medical bills reached the Plan’s deductible, so the

explanation of benefits for Doe’s fourth admission advised that the claim was covered 100% by

the Plan, but the payment “[w]ould be held for stop-loss reimbursement.” Once Carthage reached

its deductible under the Gerber Excess Loss Insurance Policy, BMI continued to process the claims

and then submitted the excess claims to Gerber for further processing and claim payment funding.

Upon receipt of St. Luke’s claims for payment, Gerber unilaterally determined that St. Luke’s was

an out-of-network provider under the Plan.

 Because it did not receive payment as an in-network provider, St. Luke’s sued BMI on

March 4, 2016, alleging breach of contract, promissory estoppel, unjust enrichment, and violation

of Missouri’s Prompt Payment Act (“MPPA”). BMI then filed a third-party petition against

Carthage, alleging breach of contract and common law and contractual indemnification. Carthage

filed a third-party petition against Gerber, alleging breach of contract, indemnity, and vexatious

refusal to pay claims. St. Luke’s was granted leave to file a first amended petition, which added

counts for breach of contract, promissory estoppel, and unjust enrichment against Carthage; and

 5
 After the last hospital admission, Doe passed away on February 9, 2015.

 5
counts of prima facie tort, fraudulent misrepresentation, and violation of the MPPA against BMI,

Carthage, and Gerber. Gerber filed a cross-petition against Carthage, alleging a claim for

indemnity. Gerber then filed an amended cross-petition, adding BMI and adding a claim for

contribution and/or equitable indemnity. Carthage filed a cross-claim against BMI, alleging counts

for errors and omissions in breach of contract, breach of duty of good faith and fair dealing, and

indemnity and defense. Carthage also filed a cross-claim against Gerber, alleging counts for

indemnity and defense, and vexatious refusal to pay claims. Carthage also filed a counterclaim

against Gerber, alleging counts for breach of contract, breach of good faith and fair dealing,

indemnity and defense, and vexatious refusal to pay claims. BMI also filed a counterclaim against

Gerber, alleging one count of contribution and/or equitable indemnity.

 BMI and Carthage originally alleged in their pleadings before the trial court that

St. Luke’s was in-network under the Plan. However, after BMI and Carthage entered into an

agreement with Gerber on or about May 2017, BMI and Carthage abruptly changed their position

as to the in-network provider status of St. Luke’s and joined Gerber in jointly stipulating to the

dismissal, without prejudice, of all claims, third-party claims, cross-claims, and counterclaims

Defendants had asserted against one another. In light of that joint dismissal, St. Luke’s requested

production of all agreements between BMI, Carthage, and Gerber related to the litigation. The

trial court granted St. Luke’s motion to compel documents responsive to St. Luke’s request,

resulting in the production of a document titled “Tolling Agreement,” which stated that it was

entered into “for purposes of tolling any statute(s) of limitations and reserving rights as to the

[third-party] Claims as well . . . as any other claims between the parties relating to [Doe] and the

Services he received.” In the Tolling Agreement, BMI, Carthage, and Gerber waived their right

to argue any statute of limitations, laches, estoppel, “or any other legal or equitable claim or

 6
defense, or any evidentiary or procedural rule or presumption, based on the lapse of time” should

there be any subsequent litigation between Defendants as to the Doe claims. In exchange for this

tolling agreement, Defendants agreed to jointly dismiss all of their claims against each other in the

current litigation involving the Doe claims.

 The case was originally set for trial on October 16, 2017. Shortly before trial, multiple

motions for summary judgment filed by Defendants were granted in part and denied in part. The

trial setting was cancelled, and on October 27, 2017, St. Luke’s filed a motion for leave to file a

second amended petition, which was granted by the trial court on December 12, 2017. St. Luke’s

asserted multiple claims against BMI, Carthage, and Gerber, four of which are at issue in this

appeal:6

 • Breach of the CSA MultiPlan network contract vs. BMI. St. Luke’s alleged that it was a

third-party beneficiary to BMI’s CSA with MultiPlan and that BMI breached its obligation under

the CSA to pay or arrange for Carthage to make payment to St. Luke’s at the MultiPlan contract

rates.

 • Promissory Estoppel vs. BMI. St. Luke’s asserted that BMI promised St. Luke’s that

St. Luke’s would be paid for the healthcare services provided to Doe at the MultiPlan network

rates and at the in-network benefit level of the Plan and that St. Luke’s detrimentally relied on that

promise when it provided and continued to provide healthcare services to Doe.

 • Breach of the Carthage Plan’s MultiPlan network terms vs. Carthage. St. Luke’s asserted

that it fully performed its contractual obligations under the MultiPlan network agreement (the

terms of which BMI bound Carthage to pursuant to its ASA with Carthage and the corresponding

terms of the Plan) when it provided healthcare services to Carthage member Doe at the negotiated

 6
 All other claims asserted by St. Luke’s against the Defendants were summarily disposed of by the trial
court’s grant of summary judgment and have been abandoned on appeal.

 7
MultiPlan network rates and that Carthage breached the Plan by not paying St. Luke’s at the

in-network provider MultiPlan contract rates.

 • Violation of the MPPA vs. BMI, Carthage, and Gerber. St. Luke’s asserted that BMI,

Gerber and Carthage were all “health carriers” under the MPPA and that they failed to timely pay

St. Luke’s for the services provided to Doe following St. Luke’s submission of the claims to

Defendants, subjecting them to the MPPA’s penalty provisions.

 Thereafter, the parties engaged in additional discovery, and Defendants filed the motions

for summary judgment that are at issue in this appeal.

 In December 2018, Defendants jointly moved for leave to amend their responsive pleadings

to include affirmative defenses and counterclaims. The trial court’s denial of Defendants’ motion

for leave to amend is a subject of Defendants’ cross-appeals.

 On August 23, 2019, the trial court granted summary judgment to Gerber on St. Luke’s

MPPA claim, ruling: “St. Luke’s submission of claims by facsimile transmission is insufficient to

bring the claim against Gerber within the purview of the MPPA.” On September 18, 2019, the

trial court granted summary judgment to BMI, applying the same rationale. The trial court also

ruled that St. Luke’s lacked standing to sue for breach of the Plan and for breach of the CSA, and

even if it had standing, St. Luke’s was not an in-network provider under the Plan or the CSA. On

October 18, 2019, the trial court concluded that Carthage also was not subject to the MPPA, for

the reasons set forth in the September 18, 2019 summary judgment order.

 At that point, St. Luke’s sole remaining claim was for promissory estoppel against BMI.

On October 21, 2019, BMI moved for judgment on the pleadings and, on October 25, 2019, the

trial court granted BMI’s motion.7

 7
 St. Luke’s had also asserted a claim for promissory estoppel against Carthage, as to which the trial court
granted summary judgment in favor of Carthage on the argued basis that Carthage, a public entity, could not be subject

 8
 St. Luke’s timely appealed.8 And, BMI, Gerber, and Carthage timely cross-appealed.

 Summary of Points on Appeal

 St. Luke’s asserts six points on appeal. Points I through V claim that the trial court erred

in granting summary judgment against it. In Points I and II, St. Luke’s argues that the trial court

erroneously concluded that St. Luke’s lacked standing to assert its breach of contract claim against

Carthage as an in-network provider for payment pursuant to the terms of the Plan. In Point III,

St. Luke’s asserts that, on its claim against Defendants for violation of the MPPA, the trial court

erroneously concluded that the MPPA was not applicable because St. Luke’s did not submit the

Doe claims in an electronic format as required by the statute. In Points IV and V, St. Luke’s argues

that, on its claim against BMI for breach of BMI’s CSA with MultiPlan, the trial court erroneously

concluded that St. Luke’s lacked standing because St. Luke’s was not a third-party beneficiary of

BMI’s CSA with MultiPlan and was not an in-network provider under the CSA. Finally, in

to claims based on implied contracts pursuant to section 432.070. St. Luke’s has not appealed that ruling. BMI’s
motion for judgment on the pleadings argued that the trial court’s dismissal of the promissory estoppel claim against
Carthage should be extended to BMI as BMI had at all times been acting as Carthage’s agent.
 8
 A judgment is a “final judgment” if it “‘resolves all claims by and against all parties, or it resolves the last
such claim and some (but not all) claims have been resolved previously.’” Wilson v. City of St. Louis, 600 S.W.3d
763, 768 (Mo. banc 2020) (quoting State ex rel. Henderson v. Asel, 566 S.W.3d 596, 598 (Mo. banc 2019)). Thus:

 [W]hen a judgment is entered in the case disposing of the last claim, that becomes the “final
 judgment” for purposes of appeal and it necessarily incorporates all prior orders or judgments that
 adjudicated some—but fewer than all—of the claims and the rights and liabilities of all the parties.
 This is so regardless of whether such incorporation is addressed explicitly (or implicitly) in the final
 judgment itself.

Henderson, 566 S.W.3d at 598 n.2 (citation omitted) (internal quotation marks omitted). On October 25, 2019, the
trial court granted BMI’s motion for judgment on the pleadings. That judgment/order disposed of the last claim against
the last party in this case. Carthage filed a motion to amend on November 6, 2019, which the trial court denied by
docket entry on December 19, 2019. The judgment became final on the date the motion to amend was denied;
therefore, the notice of appeal was due December 30, 2019. St. Luke’s filed its notice of appeal on December 2, 2019.
“A premature notice of appeal shall be considered as filed immediately after the time the judgment becomes final for
the purposes of appeal.” Chastain v. Geary, 539 S.W.3d 841, 847 n.8 (Mo. App. W.D. 2017) (citing Rule 81.05(b))
(internal quotation marks omitted). St. Luke’s appealed from a final judgment, and its notice of appeal was timely;
therefore, we have authority to hear this appeal.

 9
Point VI, St. Luke’s asserts that the trial court erred in granting judgment on the pleadings against

it on its promissory estoppel claim against BMI.

 BMI and Carthage each assert two points on cross-appeal, and Gerber asserts one point. In

BMI’s first point, Gerber’s first point, and Carthage’s second point, they contend that the trial

court erred in denying their request for attorney fees under the MPPA. In BMI’s second point and

Carthage’s first point, they argue that the trial court erred in denying their joint motion for leave

to file an amended answer and counterclaim.

 Analysis

 Standard of Review (Points I-V)

 We review a grant of summary judgment de novo. ITT Commercial Fin. Corp. v. Mid-Am.

Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is appropriate

“where the moving party has demonstrated, on the basis of facts as to which there is no genuine

dispute, a right to judgment as a matter of law.” Id. (citing Rule 74.04).

 Point I

 In St. Luke’s first point, it asserts that the trial court erred in granting summary judgment

against it on its claim against Carthage for breach of the Plan on the ground that St. Luke’s lacked

standing to assert its claim for in-network payment against the Defendants. St. Luke’s claims that

it was the real party in interest entitled to enforce the Plan benefits claim in that, under the

assignments of benefits executed before treatment, Doe assigned his entire “interest and right” in

his Plan benefits to St. Luke’s. We agree.

 “A party has standing to sue when it has an interest in the subject matter of the suit that

gives it a right to recovery, if validated.” Cygnus SBL Loans, LLC v. Hejna, 584 S.W.3d 324, 335

(Mo. App. W.D. 2019) (internal quotation marks omitted). “[T]he doctrine of standing . . . requires

 10
that a party seeking relief have a legally cognizable interest in the subject matter of [its] suit and a

threatened or actual injury.” Cohen v. Normand Prop. Assocs., L.P., 498 S.W.3d 473, 478 n.4

(Mo. App. W.D. 2016) (internal quotation marks omitted). “‘Standing to sue evaluates the

sufficiency of a plaintiff’s interest in the subject of the lawsuit. It is a concept used to ascertain if

a party is sufficiently affected by the conduct complained of in the suit, so as to [e]nsure that a

justiciable controversy is before the court.’” Id. (quoting City of Wellston v. SBC Commc’ns, Inc.,

203 S.W.3d 189, 193 (Mo. banc 2006)).9

 Each time Doe was admitted, St. Luke’s obtained from him a Consent and Agreement of

Health Care Services, which document contained a paragraph titled “ASSIGNMENT OF

BENEFITS” that stated in pertinent part:

 I hereby assign to Saint Luke’s Health System’s entities and any or all physicians;
 all of my interest and right to the insurance benefits otherwise payable to me for
 this hospitalization or outpatient services arising out of any policy of insurance,
 self-insured health plan, Medicare or Medicaid in my name or on my behalf.

“An assignment passes all the assignor’s title or interest in the subject matter to the assignee and

divests the assignor of all right of control over the subject matter.” Marvin v. State Farm Mut.

Auto. Ins. Co., 894 S.W.2d 712, 713 (Mo. App. W.D. 1995). In Marvin, when an insured’s children

were injured in an accident, the insured assigned her rights to receive medical benefits from State

Farm Mutual Automobile Insurance Company to Midtown Chiropractic Clinic in consideration

for her children’s treatment by a chiropractic practitioner. State Farm, however, paid the benefits

to its insured, and the insured did not pay Midtown Clinic. Midtown Clinic sued State Farm for

 9
 “Though the concepts of real party in interest and standing are closely related, they are not strictly
synonymous.” Cohen v. Normand Prop. Assocs., L.P., 498 S.W.3d 473, 478 n.4 (Mo. App. W.D. 2016). “Real parties
in interest are persons who are directly interested in a lawsuit’s subject matter and are entitled to maintain the action.”
Id. at 478 (internal quotation marks omitted). “Capacity to sue refers to the status of a person or group as an entity
that can sue or be sued, and is not dependent on the character of the specific claim alleged in the lawsuit.” Id. at 478
n.4 (internal quotation marks omitted).

 11
the benefits, and the trial court ruled in State Farm’s favor. Id. at 712. This Court found that when

the insured assigned to Midtown Clinic her rights to State Farm’s insurance payments, Midtown

Clinic gained all of the insured’s rights as beneficiary of the insurance policy’s proceeds. Id. at

713. The insured no longer had title or an interest to the insurance proceeds; Midtown Clinic

became the insured for the purposes of receiving the medical benefits. Id. We explained that:

 State Farm had an obligation to pay the insured or a person authorized by law to
 receive such payment. Midtown Clinic qualified under either option. Because of
 the assignment, it became an entity authorized by law to receive payment. Also,
 because of the assignment, it gained the rights of the insured. State Farm was
 required by its policy and by the assignment to pay Midtown Clinic.

Id.

 Here, when Doe assigned to St. Luke’s “all of [his] interest and right to the insurance

benefits otherwise payable to [him] for this hospitalization . . . arising out of any . . . self-insured

health plan . . . in [his] name or on [his] behalf,” St. Luke’s became the insured for the purposes

of receiving the insurance benefits and gained the right to sue Carthage for those benefits when

they were denied.

 Point I is granted.

 Point II

 In Point II, St. Luke’s asserts that the trial court erred in granting summary judgment

against it on the merits of its breach of contract claims against Carthage as to the Plan on the

grounds that St. Luke’s was out-of-network.10 All of the parties to this appeal agree that the Plan

is an unambiguous insurance policy “and interpretation of the contract is for the court to

determine” as a matter of law. See In re Marriage of Lueken, 267 S.W.3d 800, 803 (Mo. App.

E.D. 2008) (citing to Enyeart v. Shelter Mut. Ins. Co., 693 S.W.2d 120, 123 (Mo. App. W.D.

 10
 Specifically, the trial court concluded that St. Luke’s was not in-network because “Page 1 of the Carthage
Plan does not list MultiPlan as a ‘Network provider’ or include any national wrap-around PPO.”

 12
1985)). In other words, all of the parties to this appeal have requested that we declare as a matter

of law whether St. Luke’s qualifies as an “in-network” or “out-of-network” provider under the

plain and unambiguous terms of the Plan.

 The “interpretation of an insurance policy is a question of law that this Court also
 determines de novo.” Owner’s Ins. Co. v. Craig, 514 S.W.3d 614, 616 (Mo. banc
 2017) (quoting Seeck v. Geico Gen. Ins. Co., 212 S.W.3d 129, 132 (Mo. banc
 2007)). “When interpreting an insurance policy, this Court gives the policy
 language its plain meaning, or the meaning that would be attached by an ordinary
 purchaser of insurance.” Doe Run Res. Corp. v. Am. Guar. & Liab. Ins., 531
 S.W.3d 508, 511 (Mo. banc 2017). . . . A policy must be enforced as written when
 its language is clear and unambiguous.

Seaton v. Shelter Mut. Ins. Co., 574 S.W.3d 245, 247 (Mo. banc 2019).

 Specifically, St. Luke’s argues in this appeal that the Plan and Doe’s incorporated

identification card unambiguously designated MultiPlan medical providers, like St. Luke’s, as

in-network providers. We agree.

 MultiPlan offered “various healthcare cost management services including but not limited

to creating and maintaining networks of health care providers” by entering into agreements with

network providers that agreed to accept agreed-upon reimbursement rates as payment for

healthcare services rendered to covered individuals. BMI contracted to purchase “the network

services and/or other managed care related services” from MultiPlan, as BMI was authorized by

Carthage to do. The MultiPlan agreement defined a network as “[a]n arrangement of Network

Providers, created and/or maintained by [MultiPlan] or any of its subsidiaries, who have agreed to

certain Contract Rates for Covered Services provided to Participants.” A network provider entered

into an agreement with MultiPlan for participation in the network. St. Luke’s was a provider that

contracted with MultiPlan.

 The Carthage Plan defined a network provider as:

 13
 any provider having a contractual relationship with the [P]lan at the time treatment,
 care, services or supplies are provided. This will include any provider that
 negotiates with Benefit Management, Inc. before or after services are rendered.
 BMI negotiations will always be paid at the PPO level of benefits. A network
 provider may also include any provider who is contracted with one of BMI’s
 national wrap-around PPO’s if allowed by the [P]lan as stated on page 1.

(Emphasis added.) Page 1 of the Carthage Plan explained the medical plan concept of a preferred

provider network:

 In an effort to better control costs and promote quality service, the Plan is
 participating in a discount program. Employees and their dependents are given the
 opportunity to utilize physicians and hospitals who have contracted with the
 Plan, also called in-network providers. . . . [I]f the Plan member utilizes an
 in-network provider, the Plan will pay at a higher benefit percentage than if the
 member were to see an out-of-network provider. . . . The Plan member’s personal
 identification card will notify the provider of membership in the program.

(Emphasis added.)

 “‘The cardinal principle of contract interpretation is to ascertain the intention of the parties

and to give effect to that intent.’” Health Care Found. of Greater Kansas City v. HM Acquisition,

LLC, 507 S.W.3d 646, 656 (Mo. App. W.D. 2017) (quoting Dunn Indus. Grp., Inc. v. City of Sugar

Creek, 112 S.W.3d 421, 428 (Mo. banc 2003)). The terms of a contract are read as a whole to

determine the intention of the parties, and the terms are given their plain, ordinary, and usual

meaning. Id. “The plain and ordinary meaning of a word is found in the dictionary.” Barrett v.

Greitens, 542 S.W.3d 370, 381 (Mo. App. W.D. 2017). “Additionally, each term of a contract is

construed to avoid rendering other terms meaningless. A construction that attributes a reasonable

meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions

without function or sense.” Health Care Found., 507 S.W.3d at 656 (citation omitted) (internal

quotation marks omitted).

 The trial court’s interpretation—that St. Luke’s was not in-network because page 1 of the

Carthage Plan did not specifically list MultiPlan as a network provider or include any national

 14
wrap-around PPO—would render meaningless the Plan’s provisions that “[a] network provider

may also include any provider who is contracted with one of BMI’s national wrap-around PPO’s

if allowed by the [P]lan as stated on page 1,” which states that “[t]he Plan member’s personal

identification card will notify the provider of membership in the [preferred provider network

discount] program.” The MultiPlan logo appeared on Doe’s insurance identification card,11

which he presented to St. Luke’s.

 Though unnecessary to our interpretation of the Plan, we find it no coincidence that—prior

to the Defendants entering into the Tolling Agreement and voluntarily dismissing without

prejudice all of their claims against one another—representatives of both BMI and Carthage

agreed that the plain meaning of the unambiguous terms of the Plan was that St. Luke’s clearly

and unequivocally qualified as an “in-network” provider. For example, in response to any

suggestion that page 1 must name MultiPlan for St. Luke’s to be in-network, BMI’s President,

Mr. David A. Powell, explained:

 The Discount program listed on page 1 of the [Plan] is under the heading, Preferred
 Provider Network. The discount program includes MultiPlan providers in the
 network. That section mentions the member’s identification card[,] which bears
 Tristate Coalition, Multiplan and Coalition America program logos. Those
 identifying logos show who is included in the Plan’s Preferred Provider Network
 but that is not an exclusive list. That Medical Plan Concept is explained in layman’s
 terms so Plan members can understand. I don’t see why you can not [sic] make the
 connection.

 BMI has administered the benefits for this Plan for 16 years and my signature
 appears on every check issued. So I think I understand better than anyone how the
 Plan works. . . .

 11
 Missouri courts recognize that “[w]here a writing refers to another document, that other document, or the
portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a
single instrument.” Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc., 204 S.W.3d 183, 196 (Mo. App. E.D. 2006).
To incorporate a document into a contract by reference, the contract must “make[ ] clear reference to the document
and describe[ ] it in such terms that its identity may be ascertained beyond doubt.” Id. “The incorporated matter is to
be interpreted as part of the writing.” Id. Doe’s insurance card meets those requirements; thus, we consider Doe’s
insurance card incorporated by reference into the Plan.

 15
Similarly, when Carthage demanded assistance from the Missouri Division of Insurance with the

payment of Doe’s insurance claim for in-network benefits to St. Luke’s that it argued were

wrongfully denied by Gerber, Carthage Assistant Superintendent of Business, Dr. Mark Baker,

explained (1) why St. Luke’s was in-network under the Plan and (2) that Gerber had previously

reimbursed MultiPlan providers as in-network:

 BMI processed the claims in question strictly according to our Plan Document and
 our Administrative Service Agreement with them. Mr. [Doe] received the majority
 of his healthcare from St. Luke’s Hospital and their staff physicians in Kansas City,
 Missouri. These providers have contracted with Multiplan and consequently are
 to be paid at the in-network benefit level by our Plan.

 To receive in-network benefits from our plan, members must utilize contracted PPO
 providers. St. Luke’s and their physicians are contracted with BMI’s national
 wrap-around PPO, Multiplan. Multiplan is identified with their logo on our
 members’ ID cards. . . . These Plan provisions are explained on page 1 and 24
 in our Plan Document. Use of wraparound PPO networks to gain discounts
 and provide in-network benefits is a standard industry practice. Health plans
 and excess loss carriers routinely reimburse those claims as such. Gerber Life
 Insurance Company and RMTS[12] refused to reimburse our excess claims
 according to our contract with them, citing that Mr. [Doe’s] claims should have
 been paid as out-of-network providers. . . . There was never a claim denied as being
 out-of-network in the first four and a half years we bought coverage from
 Gerber-RMTS. In fact, Gerber-RMTS reimbursed a 2013 Multiplan claim to us at
 the 100% in-network benefit.

(Emphasis added.) Carthage’s designated corporate representative, Dr. Baker, also testified as to

the reason why BMI and Carthage considered St. Luke’s an in-network provider:

 Q. What is the purpose of including the MultiPlan logo on the insurance card?
 ....

 A. Our purpose to have it included is just to show there are opportunities
 outside our area to be included for a network.

 Q. And so does the logo communicate to Carthage members that MultiPlan
 providers are considered in-network under the Carthage plan?

 A. That is our intent, yes.

 12
 The Gerber policy purchased by Carthage was administered by a managing general underwriter, RMTS.

 16
 Q. And does it similarly communicate to healthcare providers that are within
 the MultiPlan network that MultiPlan is considered in-network under the
 Carthage plan?
 ....

 A. I assume it does.

 These unequivocal admissions by both Carthage’s corporate representative and Carthage’s

Plan Administrator are consistent with this Court’s interpretation of the Plan and our corresponding

conclusion that, as a matter of law, St. Luke’s qualified as an in-network provider under the Plan.13

 Based upon the Plan’s unambiguous terms, the Plan can “allow” any provider who

contracts with one of BMI’s national wrap-around PPO’s, like MultiPlan, to be an in-network

provider, and “[t]he Plan member’s personal identification card will notify the provider of

membership in the program” by placing logos on the identification card. St. Luke’s contracted

with BMI’s national wrap-around PPO, MultiPlan; MultiPlan was identified with its logo on Doe’s

personal identification card; therefore, St. Luke’s was to be treated as an in-network provider under

the Plan and is entitled to pursue its breach of contract claim against Carthage for violation of the

terms of the Plan. The trial court’s summary judgment ruling to the contrary is reversed.

 Point II is granted.

 Point III

 In St. Luke’s third point, it asserts that the trial court erred in concluding that the MPPA

was not applicable because St. Luke’s did not submit the Doe claims in an electronic format as

required by the statute. Specifically, St. Luke’s argues that it complied with the MPPA because:

 13
 Though St. Luke’s did not file its own motion for summary judgment below and, hence, we are not
permitted in this appeal to enter partial summary judgment in favor of St. Luke’s on its status as an in-network
provider, see Betts-Lucas v. Hanson, 31 S.W.3d 484, 486 (Mo. App. W.D. 2000), in order to resolve this appeal this
Court was tasked with the responsibility of interpreting the plain and unambiguous terms of the insurance contract,
and we have done so. As our ruling reflects, as a matter of law, St. Luke’s qualifies as an in-network provider pursuant
to the unambiguous terms of the Plan. Upon remand, the trial court shall be guided by our interpretation as such in
all further proceedings below.

 17
(1) section 376.384.2 did not require it to submit its claims in an electronic format when BMI did

not provide readily accessible electronic filing and insisted on and processed paper or fax

submission of the Doe claims; (2) St. Luke’s submitted the Doe claims in an electronic format to

its clearinghouse; and (3) the MPPA does not require that health carriers “receive” claims in an

electronic format.

 Section 376.384.2 of the MPPA prescribes the method a healthcare provider must use to

submit claims for reimbursement:

 On or after January 1, 2003, all claims for reimbursement for a health care service
 provided in this shall be submitted in an electronic format consistent with federal
 administrative simplification standards adopted pursuant to the Health Insurance
 Portability and Accountability Act of 1996. Any claim submitted by a health care
 provider after January 1, 2003, in a nonelectronic format shall not be subject to the
 [penalty and interest] provisions of section 376.383. Any health carrier shall
 provide readily accessible electronic filing after this date to health care providers.

(Emphasis added.) “The primary rule of statutory interpretation is to effectuate legislative intent

through reference to the plain and ordinary meaning of the statutory language.” Moore v. Bi-State

Dev. Agency, 609 S.W.3d 693, 696 (Mo. banc 2020) (internal quotation marks omitted). “When

the words are clear, there is nothing to construe beyond applying the plain meaning of the law.”

Id. (internal quotation marks omitted). We apply rules of statutory construction only to resolve an

ambiguity when we cannot determine the legislative intent from the plain statutory language. Id.

 The plain language of section 376.384.2 provides that “all claims for reimbursement for a

health care service provided in this [sic] shall be submitted in an electronic format.” (Emphasis

added.) “Generally[,] the word ‘shall’ connotes a mandatory duty.” State ex rel. Universal Credit

Acceptance, Inc. v. Reno, 601 S.W.3d 546, 548 (Mo. banc 2020) (internal quotation marks

omitted). The statute also provides a consequence for failing to follow its terms: “[a]ny claim

submitted by a health care provider . . . in a nonelectronic format shall not be subject to the [penalty

 18
and interest] provisions of section 376.383.” “When a statute or rule provides the consequence of

failing to follow its terms, it is mandatory and must be obeyed.” Id. (internal quotation marks

omitted).

 St. Luke’s attempts to avoid the consequences of its failure to submit its claims in electronic

format. It claims that the health carrier’s provision of a readily accessible electronic filing is a

precondition to the MPPA’s electronic-format-submission requirement. That BMI requested mail

and/or fax submission does not absolve St. Luke’s from compliance with the statute. There is

nothing in the summary judgment record to indicate that St. Luke’s requested and BMI refused to

provide readily accessible electronic filing in compliance with section 376.384.2. Furthermore, in

the summary judgment record, St. Luke’s contended that its claims were sent electronically to BMI

by facsimile.

 As the trial court pointed out, section 376.383 expressly distinguishes between electronic

and facsimile and the provision that St. Luke’s relies upon does not reference “facsimile” as an

alternative format of communicating the claim. See § 376.383.1(8) (electronic or facsimile

request), § 376.383.3 (electronic or facsimile notice), § 376.383.4 (electronic or facsimile notice).

“The provisions of a legislative act are not read in isolation but construed together, and if

reasonably possible, the provisions will be harmonized with each other.” R.M.A. by Appleberry v.

Blue Springs R-IV Sch. Dist., 568 S.W.3d 420, 429 (Mo. banc 2019) (internal quotation marks

omitted). “In determining the intent and meaning of statutory language, the words must be

considered in context and sections of the statutes in pari materia, as well as cognate sections, must

be considered in order to arrive at the true meaning and scope of the words.” Id. (internal quotation

marks omitted). St. Luke’s submission of claims to BMI by facsimile transmission does not bring

them within the purview of the MPPA.

 19
 St. Luke’s also argues that its submission of the Doe claims to its clearinghouse in

electronic format satisfied the MPPA’s electronic-format-submission requirement. “When a term

is not defined by statute, this Court will give the term its plain and ordinary meaning as derived

from the dictionary.” Hegger v. Valley Farm Dairy Co., 596 S.W.3d 128, 131-32 (Mo. banc 2020)

(internal quotation marks omitted). “Submit” is defined as “send or commit for consideration,

study, or decision.” WEBSTER’S THIRD NEW INT’L DICTIONARY 2277 (Unabridged 1961). Under

the MPPA, “claims for reimbursement for a health care service . . . submitted in an electronic

format” are sent to the health carrier for decision, and the statute imposes penalties on a health

carrier that fails to meet the statutory deadlines. See §§ 376.383.4, .5, .6. The statute also contains

deadlines related to when a claim or additional information is received by a health carrier. See

§ 376.383.2 (within forty-eight hours after receipt of electronically filed claim by health carrier),

§ 376.383.3 (within thirty processing days after receipt of claim by health carrier), § 376.383.4

(within ten processing days after receipt of additional information by health carrier). On the other

hand, a clearinghouse is a third-party intermediary that contracts with both providers and payors

to facilitate the transmission of claims for payment from healthcare providers to healthcare payors.

We agree with the trial court that:

 [i]nterpreting “shall be submitted in an electronic format” to apply only to how a
 claimant submits its claims to its own clearinghouse would be unreasonable and
 inconsistent with the objectives to be accomplished through the MPPA. Thus
 “submitted” as used in the MPPA clearly refers to how claims are transmitted to
 the health carrier, not just the claimant’s clearinghouse.

 Electronic submission to the health carrier is mandatory, and since St. Luke’s did not

submit its claims electronically to BMI, the MPPA does not apply.14 Therefore, St. Luke’s claim

fails as a matter of law, and summary judgment was appropriate.

 14
 We recognize that this is a harsh result where, as here, BMI expressly requested non-electronic formatting
for submission of claims from the third-party claims intermediary for St. Luke’s—where section 376.384.2 expressly

 20
 Point III is denied.

 Points IV and V

 In St. Luke’s fourth point, it asserts that the trial court erred in granting summary judgment

in favor of BMI on St. Luke’s claim for breach of BMI’s CSA MultiPlan contract on the ground

that St. Luke’s lacked standing. St. Luke’s contends that it is a third-party beneficiary entitled to

enforce BMI’s MultiPlan contract.

 “A third-party beneficiary is one who is not privy to a contract but may nonetheless

maintain a cause of action for breach of contract.” Septagon Constr. Co. Inc.-Columbia v. Indus.

Dev. Auth. of City of Moberly, 521 S.W.3d 616, 624 (Mo. App. W.D. 2017). The rights of

third-party beneficiaries depend on the terms of the contract itself. Id. at 625. “The third-party

beneficiary need not be named in the contract, but the contract terms must clearly and directly

express an intent to benefit an identifiable person or class.” Id. “A party claiming third-party

beneficiary rights has the burden of showing that provisions of the contract were intended for its

direct benefit.” Id.

 There are three types of third-party beneficiaries: donee, creditor, and incidental. Id.

“Donee and creditor beneficiaries may pursue actions and recover under a contract, but incidental

beneficiaries may not.” Id. “‘A donee third-party beneficiary exists when the purpose of the

promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the

mandated that “[a]ny health carrier shall provide readily accessible electronic filing . . . to health care providers.”
(emphasis added). But, the Missouri Prompt Payment Act (“MPPA”) contemplated that the entities involved in the
subject of the MPPA’s provisions are all sophisticated medical provider and medical payment entities. Although
St. Luke’s was fully aware that it had a right to demand that Carthage and/or BMI accept its claims in an electronic
format, it did not compel Carthage and/or BMI to do so. Hence, St. Luke’s cannot now assert claims for penalties
under a statutory construct that it did not follow. Conversely, as we explain in our ruling as to the Defendants’ separate
cross-appeal claims for attorney’s fees under the same statutory provisions that it chose to ignore (regarding the
mandate that health carriers “shall” provide readily accessible electronic filing), neither can Defendants take advantage
of penalty provisions where they have ignored those provisions of the MPPA that they did not like. As the 17 th century
Englishman, John Ray, first said in his publication of A COMPLETE COLLECTION OF ENGLISH PROVERBS circa 1670,
“What’s good for the goose is good for the gander.”

 21
beneficiary or to confer upon him a right against the promisor to some performance neither due

nor supposed nor asserted to be due from the promisee to the beneficiary.’” Id. (quoting L.A.C.

ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P., 75 S.W.3d 247, 260 (Mo. banc 2002))

(internal quotation marks omitted). “A creditor beneficiary is one upon whom the promisee

intends to confer the benefit of the performance of the promisee’s contract with the promisor and

thereby discharge an obligation or duty the promisee owes the beneficiary.” Id. (internal quotation

marks omitted). “[A]n incidental beneficiary is one who will benefit from the performance of the

promise but is neither a promisee nor an intended beneficiary.” Id.

 Third-party beneficiaries do not have standing to sue on a contract if they are incidental

beneficiaries that benefit only collaterally from the contract. Zygler v. Hawkins Constr., 609

S.W.3d 61, 69 (Mo. App. E.D. 2020) (citing State ex rel. William Ranni Assoc., Inc. v. Hartenbach,

742 S.W.2d 134, 140 (Mo. banc 1987)). “Only those third parties for whose primary benefit the

contracting parties intended to make the contract may sue on the contract . . . [and] the terms of

the contract must clearly express an intent to benefit the third party.” Fuller v. Partee, 540 S.W.3d

864, 870 (Mo. App. W.D. 2018) (internal quotation marks omitted).

 “Contracts are made for the direct benefit of the contracting parties.” Roskowske v. Iron

Mountain Forge Corp., 897 S.W.2d 67, 72 (Mo. App. E.D. 1995). “Other parties frequently derive

some incidental benefit from the performance of the contract, but this gives them no right to

enforce it.” Id. “Moreover, the contract terms must clearly express that the contracting parties

intended the third party to be the beneficiary of performance of the contract and have the right to

maintain an action on the contract.” Id. “Though a third-party beneficiary need not be named in

the contract, the terms of the contract must directly and clearly express an intent to benefit the

specific party or an identifiable class of which the party asserting rights as a third-party beneficiary

 22
is a member.” Id. “A strong presumption arises that the parties were not contracting for third

persons.” Id. “Thus, the implication to overcome the presumption must be so strong as to amount

to an express declaration.” Id.

 Doe was a participant under the Plan. Under the Plan, BMI administered claims pursuant

to its ASA with Carthage. BMI contracted with MultiPlan through a CSA. Under the CSA, BMI

was a “Client”; Carthage was a “User”; and St. Luke’s was a “Network Provider” within the

MultiPlan Provider Network. St. Luke’s argues that sections D(6)(a) and D(6)(f) of the CSA

expressed a clear intent to make it an intended beneficiary of the CSA.

 Section D(6)(a) of the CSA between BMI and MultiPlan relates to Client responsibilities

in connection with Network Services, specifically, compliance with the Network Provider

Agreement. St. Luke’s focuses on the following language in section D(6)(a):

 Client acknowledges that certain Network Providers in the PPO Network are third
 party beneficiaries to this Agreement. Should Client seek to have access to the
 Network Provider Agreements with the Baylor Healthcare System and the
 HealthTexas Provider Network, the Baylor affiliated physicians located in Texas,
 and meet the qualifications for such access, Client shall sign an acknowledgement
 in a form identical to the one attached hereto as an exhibit to this Agreement.

(Emphasis added.) St. Luke’s argues that the “certain Network Providers” language in

section D(6)(a) means that all network providers except the Texas providers “are third party

beneficiaries to this Agreement.” We disagree. To the contrary, the contract language plainly

indicates that only “certain Network Providers . . . are third party beneficiaries” to the CSA. If the

word “certain” is to have any meaning, the notion must be that the “Network Providers” being

referenced must be specifically identified with “certainty” and to the exclusion of others not so

denominated. In the CSA, the only specifically identified providers are Baylor Healthcare System

and HealthTexas Provider Network. Simply put, St. Luke’s is not a network provider specifically

or otherwise “certainly” identified as a third-party beneficiary to the CSA. The contract language

 23
in section D(6)(a) does not express a clear intent to make St. Luke’s an intended beneficiary of the

CSA.

 St. Luke’s also argues that section D(6)(f) of the CSA shows an intent to directly benefit

St. Luke’s, allegedly because it obligates BMI to timely pay St. Luke’s for services rendered under

St. Luke’s MultiPlan Network Provider Agreement:

 User’s Responsibilities. In the event that Client administers Programs on behalf of
 Users, it shall contractually obligate those Users to: (a) timely pay Network
 Providers the Contract Rates, (b) comply with the applicable terms and conditions
 of the Network Provider Agreements, and (c) comply with any applicable terms of
 this Agreement that may be the responsibility of the Users, including but not limited
 to those pertaining to the administration of the Programs and maintaining the
 confidentiality of the information described in this Agreement, the Contract Rates
 and the terms of the network provider Agreements. In the event that Client fails to
 contractually obligate its Users to such terms and conditions, Client shall be
 responsible for those obligations and [MultiPlan] shall have the right to terminate
 this Agreement as to those Users. Client represents and warrants that it has the
 authority to bind each User to the applicable terms, obligations and conditions of
 this Agreement.

The contract language relates to the obligation of a MultiPlan Client, like BMI, to contractually

obligate its Users, like Carthage, to certain terms and conditions; and if the Client fails to do so,

MultiPlan has the right to terminate the agreement as to those Users. This provision of the CSA

does not provide any rights to St. Luke’s.

 The CSA indicated that the contracting parties did not intend to provide St. Luke’s with

third-party rights under the agreement. The CSA was not made expressly for St. Luke’s benefit

or bound or obligated BMI to St. Luke’s pursuant to the terms of the CSA. St. Luke’s was,

therefore, at most, an incidental third-party beneficiary under the CSA and did not have standing

to maintain a cause of action against BMI for breach of the CSA. The trial court, therefore,

properly granted summary judgment in favor of BMI on St. Luke’s breach of contract claim as to

BMI’s CSA with MultiPlan.

 24
 Point IV is denied. Further, given our ruling as to Point IV, we need not and do not address

the substantive claim that St. Luke’s additionally asserts as to its rights under the CSA in Point V.15

 Point VI

 In St. Luke’s sixth and final point, it asserts that the trial court erred in granting judgment

on the pleadings against it on its promissory estoppel claim against BMI by extending Carthage’s

section 432.070 defense to BMI on the grounds that BMI was acting as Carthage’s agent.

 Review of a trial court’s ruling on a motion for judgment on the pleadings is de novo.

Blackwood, Langworthy & Tyson, LLC v. Knipp, 571 S.W.3d 108, 114 (Mo. App. W.D. 2019).

“Review of a grant of a motion for judgment on the pleadings requires this Court to decide whether

the moving party is entitled to judgment as a matter of law on the face of the pleadings.” Id. “For

purposes of the motion, the well-pleaded facts pleaded by the nonmoving party are treated as

admitted.” Id. “A party moving for judgment on the pleadings assumes the pleaded facts to be

true and must show that the facts are, nevertheless, insufficient as a matter of law.” Id. “The trial

court’s grant of judgment on the pleadings will be affirmed only if review of the totality of the

facts pleaded by the petitioner and the benefit of all reasonable inferences drawn therefrom reveals

that petitioner could not prevail under any legal theory.” Id. “The reviewing court is primarily

concerned with the correctness of the result, not the route taken by the trial court to reach it;

therefore, the trial court’s judgment will be affirmed if it is correct on any ground supported by the

record regardless of whether the trial court relied on that ground.” Id. (internal quotation marks

omitted).

 “A claim of promissory estoppel has four elements: (1) a promise; (2) on which a party

relies to his or her detriment; (3) in a way the promisor expected or should have expected; and

 15
 That said, we refer to our previous analysis of St. Luke’s status under the Plan in Points I and II for the
purpose of the litigation moving forward upon remand.

 25
(4) resulting in an injustice that only enforcement of the promise could cure.” Clevenger v. Oliver

Ins. Agency, Inc., 237 S.W.3d 588, 590 (Mo. banc 2007) (citing Zipper v. Health Midwest, 978

S.W.2d 398, 411 (Mo. App. W.D. 1998)). “The promise giving rise to the cause of action must be

definite, and the promise must be made in a contractual sense.” Id. (citing Zipper, 978 S.W.3d at

411. “In Missouri, promissory estoppel is not a favorite of the law, and each element must clearly

appear . . . .” Id.

 In Count II of St. Luke’s Second Amended Petition, it asserted a claim of promissory

estoppel against BMI. Promissory estoppel first requires that a promise was made. St. Luke’s

alleged that BMI promised St. Luke’s that St. Luke’s would be paid for the healthcare services

provided to Doe at the MultiPlan network rates and at the in-network benefit level of the Carthage

Plan. The second element of promissory estoppel, detrimental reliance, is also satisfied. St. Luke’s

further alleged that it relied on BMI’s promise when it provided and continued to provide

healthcare services to Doe. Finally, St. Luke’s alleged that BMI knew or should have known that

St. Luke’s would so rely. The well-pleaded facts of St. Luke’s Second Amended Petition satisfied

elements (1)-(3) of promissory estoppel. However, St. Luke’s must also satisfy the final factor

required for application of promissory estoppel: that failure to enforce the promise would result

in injustice. St. Luke’s alleged that an injustice would result if BMI was not required to tender

in-network provider payments to St. Luke’s as promised.

 The “most significant” factor to consider “‘[i]n determining whether injustice can be

avoided only by enforcement of the promise [is] the availability and adequacy of other remedies

at law.” Id. at 591 (quoting Zipper, 978 S.W.2d at 411-12).16 Given our analysis of Points I and II,

 16
 In Clevenger v. Oliver Insurance Agency, Inc., 237 S.W.3d 588 (Mo. banc 2007), the insureds were owners
of an equestrian park and received notice from a neighboring property owner that runoff from the park contaminated
a lake on the neighbor’s property. Id. at 589. When the neighbor sued the insureds, the insurance company refused
to defend on the basis that the policy excluded the claim. Id. The insureds brought an action against the insurance

 26
St. Luke’s possesses an adequate remedy at law to pursue the damages it asserts in its promissory

estoppel count.

 Given our ruling in Point II that St. Luke’s possesses the available and adequate legal

remedy of breach of contract (i.e., the Plan), which would adequately compensate it for the same

damages it seeks in its equitable relief count, St. Luke’s cannot establish the final element required

for application of promissory estoppel: that injustice17 can only be avoided by enforcement of the

promise. “Generally, equity will not intercede if an adequate remedy at law exists.” Id. (internal

quotation marks omitted). “Because [St. Luke’s] had an adequate remedy at law, equitable relief

is not appropriate.” Id. The trial court did not err in entering judgment in favor of BMI on

St. Luke’s claim in Count II premised on the doctrine of promissory estoppel.

 Point VI is denied.

agency, alleging that they had been “assured” that the policy would provide coverage for such a claim. Id.
Additionally, one of the insureds testified that he renewed the policy based on the insurance agent’s assurances. Id.
at 590. The trial court entered judgment for the insureds on their promissory estoppel claim, and the agent appealed.
The Missouri Supreme Court found that the insureds failed to show a resulting injustice that only enforcement of the
promise could cure. Id. at 591. The Court held that equitable relief based on promissory estoppel was not appropriate
since the negligence claim, on which the insureds prevailed, provided an adequate remedy. Id. Because the insureds
had an adequate remedy at law, equitable relief was not appropriate. Id.
 17
 We note that the damages at law that remain pending against Carthage as a result of our ruling today are
identical to those claimed against BMI in the promissory estoppel count, rendering the promissory estoppel claim, in
effect, an alternative to the breach of contract claim against Carthage should it be determined that St. Luke's was not
an in-network provider under the Plan. Though a party may ordinarily plead alternative remedies and elect its
preferred remedy prior to submission of the case to the fact-finder, that general principle does not apply where one of
the essential elements of an alternative remedy cannot be established as a matter of law. There is no suggestion in the
record or by representations made to this Court at oral argument that BMI was not acting as an authorized agent of
Carthage at all relevant times relating to the Plan. In fact, the parties conceded that BMI was acting as Carthage’s
authorized agent subject only to the constraint that BMI could not, by its representations to St. Luke’s, alter the Plan’s
coverage obligations. Because we have concluded as a matter of law that, consistent with BMI’s initial representations
to St. Luke’s, St. Luke’s is an in-network provider pursuant to the unambiguous terms of the Plan, St. Luke’s cannot
establish, as a matter of law, the essential element of “injustice” in connection with its promissory estoppel count
versus BMI.

 27
 Points on Cross-Appeal

 BMI’s Point I, Gerber’s Point I, Carthage’s Point II

 In BMI’s first point, Gerber’s first point, and Carthage’s second point, they contend that

the trial court erred in denying their request for attorney fees under the MPPA.

 We review a trial court’s attorney fee ruling for an abuse of discretion. Ostermeier v. Prime

Props. Invs. Inc., 589 S.W.3d 1, 6 (Mo. App. W.D. 2019). “Judicial discretion is abused when the

court’s ruling is against the logic of the circumstances and is so unreasonable and arbitrary that it

shocks the sense of justice.” Id. “Missouri courts adhere to the American Rule[,] which states

that, ordinarily, litigants must bear the expense of their own attorney’s fees.” Id. at 5 (internal

quotation marks omitted). “One common exception to the American Rule is where a statute

authorizes a trial court to award attorney’s fees.” Id. Section 376.383.6(2) of the MPPA authorizes

an award of attorney fees to be awarded a health carrier who defends a claim by a healthcare

provider where the provider was “without reasonable grounds to recover a claim.”

 Our Supreme Court has never been supportive of permitting a party to benefit from

embracing those provisions of a contract or statute that it likes while completely ignoring the

burdens attached to other provisions of the same contract or statute.

 Generally a party will not be permitted to take a position in regard to a matter which
 is directly contrary to, or inconsistent with, one previously assumed by [that
 party]. . . . The situation here is very similar to that in those cases where a party
 seeks to accept the benefits of a contract, but to reject all or a part of its burdens.
 As said in Eberting v. Skinner, [364 S.W.2d 829, 835 (Mo. App. 1963)], “he cannot
 now take the shield which she has handed him and use it as a sword against her.”

Lugena v. Hanna, 420 S.W.2d 335, 341 (Mo. 1967).

 Here, Defendants requested non-electronic claim filings by St. Luke’s and thereby rejected

the “burden” of the MPPA mandating that health carriers “shall provide readily accessible

electronic filing . . . to health care providers,” § 376.384.2, and in so doing have succeeded in

 28
“shielding” themselves from liability to St. Luke’s under the MPPA. Now, Defendants wish to

embrace the “benefit” of the MPPA’s attorney’s fees provision and use the MPPA as a “sword.”

 As our ruling today denotes, though St. Luke’s may not be able to assert its claim for

penalties under the MPPA due to its procedural shortcomings on the non-electronic format of their

claim for reimbursement, their claims are not “without reasonable grounds to recover.” Further,

we will not permit Defendants to ignore the MPPA’s mandate of their claim-receiving

requirements under the MPPA, only to then be rewarded with an award of attorney’s fees that was,

in part, created by their refusal to comply with the MPPA’s mandate for their claim-receiving

requirements.

 BMI’s Point I, Gerber’s Point I, and Carthage’s Point II are denied.18

 BMI’s Point II, Carthage’s Point I

 In BMI’s second point and Carthage’s first point, they argue that the trial court erred in

denying their joint motion for leave to file an amended answer and counterclaim.

 As a matter of right, a party may amend its pleading once before a responsive pleading is

served, or if no responsive pleading is permitted and the action has not been placed on the trial

calendar, the pleading may be amended at any time within thirty days after it is served.

Rule 55.33(a). “Otherwise, the pleading may be amended only by leave of court or by written

consent of the adverse party; and leave shall be freely given when justice so requires.” Id.

 “‘It is within the trial court’s broad discretion to allow or disallow amendments to

pleadings.’” Newell Mach. Co., Inc. v. Pro Circuit, Inc., 596 S.W.3d 635, 646 (Mo. App. W.D.

2020) (quoting Bach v. Winfield-Foley Fire Prot. Dist., 257 S.W.3d 605, 610 (Mo. banc 2008)).

A trial court abuses its discretion “when the ruling is clearly against the logic of the circumstances

 18
 For the same reasons, the joint motion filed by BMI, Gerber, and Carthage seeking attorney’s fees related
to the appeal of this case is denied.

 29
and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack

of careful, deliberate consideration.” Id. at 642-43 (internal quotation marks omitted). “‘An

appellate court will not disturb a trial court’s denial of a motion to amend a pleading unless it is

clearly erroneous.’” Id. at 646 (quoting Bach, 257 S.W.3d at 611). We consider the following

factors when determining whether the trial court erred in denying leave to amend:

 1) the hardship to the moving party that a denial would cause; 2) the reasons for the
 moving party’s failure to include the matter in the original pleadings; 3) the
 timeliness of the application for leave to amend; and 4) the hardship or injustice
 that granting leave to amend would cause to the non-moving party.

Id. (internal quotation marks omitted).

 On December 14, 2018, BMI, Carthage, and Gerber filed a joint motion for leave to file

amended answers and counterclaims. They alleged that only recently during discovery they

“learned that the facts and circumstances of the treatment and services provided by [St. Luke’s] as

relayed to BMI during the claims process in order to obtain payment were not accurate” and that

one of Doe’s treating physicians confirmed that “Doe was not a candidate for transplant, was never

on the transplant list, and his LVAD was placed as destination therapy instead of bridge to

transplant.”19 They further alleged that these new facts affected their defenses to St. Luke’s claims

in that both the Carthage Plan and Gerber’s stop-loss contract with Carthage specifically excluded

coverage for medically unnecessary and experimental and/or investigational treatment. St. Luke’s

opposed the motion, asserting that “Defendants have always known that John Doe was never on

the transplant list and received his LVAD as destination therapy.”

 On April 1, 2019, the trial court issued an order referring the matter to the previously

appointed Special Master for discovery disputes to examine the issue of when BMI, Carthage, and

 19
 A left ventricular assist device (LVAD) was placed in Doe on July 11, 2014. “This was a surgical
placement in the body to keep the heart functioning and thus keep the patient alive either indefinitely (destination
therapy) or pending a heart transplant (bridge to transplant).” L.F. Doc. 521.

 30
Gerber had information sufficient to put them on notice that Doe was not a transplant candidate.

On May 9, 2019, the Special Master filed his report. The Special Master found the most significant

and earliest documentation regarding the matter was BMI’s Utilization Review note dated June 9,

2014, to July 22, 2014.

 • On June 9, 2014, St. Luke’s informed BMI that Doe “is not a transplant candidate.”

 • On July 10, 2014, St. Luke’s requested “approval to put in an LVAD for bridge to

 transplant” but BMI “advised that [it] would need more clinical information since

 admission in June had stated he was not a heart transplant candidate.” St. Luke’s responded

 that due to a change in Doe’s body-mass index since his June 2014 admission, he was

 “being evaluated for heart transplant, but were requesting to place an LVAD 07/11/14.”

 BMI “[a]pproved the LVAD to be done” and St. Luke’s would “call on 07/14/14 regarding

 heart transplant.”

 • On July 11, 2014, Doe received LVAD.

 • On July 22, 2014, St. Luke’s informed BMI that Doe was “Status 7 awaiting transplant

 (not on active transplant list).”

The Special Master found that BMI, Carthage, and Gerber had notice of the potential dispute

regarding Doe’s eligibility to receive the LVAD implant as a covered expense in the summer of

2014.

 No objections to the Special Master’s report were filed, and the trial court adopted the

report. The trial court concluded that “[b]ased on the Special Master’s findings and after review

of the factors governing amendment requests, the Court denies Defendants’ Joint Motion for Leave

to Amend.”

 31
 Defendants’ joint motion to amend was predicated on their claim that they did not know

until December 2018 that Doe was not on the heart transplant list and that he received his LVAD

device as destination therapy. However, BMI’s own documentation confirms that the Defendants

knew that Doe was not a candidate for transplant, was not on the transplant list, and received his

LVAD as destination therapy as early as 2014. Thus, Defendants knew two years before St. Luke’s

filed its original action in 2016 about the facts underlying their proposed amendment. The purpose

of the amendment rule is “to enable a party to present evidence that was overlooked or unknown

at the time that the original pleading was filed.” Eckel v. Eckel, 540 S.W.3d 476, 488 (Mo. App.

W.D. 2018). “There is no abuse of discretion in denying the amended pleadings of parties who

fail to show the pleadings include any facts that were unknown when the original pleading was

filed.” Id. The trial court did not abuse its discretion in denying leave to amend.

 BMI’s Point II and Carthage’s Point I are denied.

 Conclusion

 The trial court’s judgment is affirmed in part, reversed in part, and remanded for further

proceedings consistent with our ruling today.

 /s/Mark D. Pfeiffer
 Mark D. Pfeiffer, Judge

Cynthia L. Martin, Chief Judge, and Thomas H. Newton, Judge, concur.

 32